No. 47,899

La Villa Fair a division of Pur-O-Zone Chemical Co., Inc., *Appellee*, v. Lewis Carpet Mills, Inc., *Appellant*.

(548 P. 2d 825)

Opinion filed April 10, 1976.

*Michael J. Grady,* of Cosgrove, Webb & Oman, of Topeka, argued the cause, and *James L. Grimes, Jr.,* of the same firm, was with him on the brief for the appellant.

*Donald S. Hults,* of Lawrence, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Miller, J.: This is an action for rescission of a portion of a contract for the purchase of carpet and for the recovery of the purchase price, interest thereon, incidental damages and loss of profit. Plaintiff (the purchaser) is a wholesaler and retailer of carpet and other furnishings specializing in apartment projects and commercial buildings. It is a Kansas corporation and its principal place of business is Lawrence, Kansas. Defendant is a carpet manufacturer, incorporated in Georgia with its principal place of business in Cartersville, Georgia.

The genesis of the business dealings of these parties was the solicitation of the plaintiff by the defendant's agent and representative in Kansas, Cla-Mar, Inc. during the winter months of 1966, 1967. These solicitations took place at the plaintiff's office in Lawrence, Kansas, and through telephone conversations between Cla-Mar in Topeka, Kansas and the plaintiff in Lawrence. As a result of these dealings plaintiff placed an order for the purchase of approximately 12,000 square yards of carpet, which order was accepted by the defendant by letter dated May 29, 1967. The carpet ordered, described as $2.80 per yard F. O. B. mill, 25 oz. face weight—100% acrylic cut pile of first quality (no seconds) was to be delivered on defendant's truck to either Kansas City, Missouri, or Lawrence, Kansas, at six cents per square yard. Prior to the shipment in question eleven smaller deliveries were made from defendant's mill to plaintiff between July 24, 1967 and August 24, 1967. All conformed to the specifications and were accepted and paid for without incident.

The carpet which gave rise to this action is twenty-one of the forty-five rolls shipped by the defendant to the plaintiff on April 26, 1968. These rolls averaged about 180 square yards each. Due to a construction strike in Kansas City in the spring of 1968, the plaintiff's purchaser, Stanley Christopher Investment Company of Lawrence, an apartment builder, was not ready to receive the carpet. Plaintiff therefore arranged with the defendant to have the defendant transport and deliver the carpet to Wagner Cartage Company, Kansas City, Missouri, for storage in their bonded warehouse until Christopher was in a position to make use of it. Apparently other carpet was also transported to Wagner Cartage for the plaintiff during April, 1968. There was some confusion at trial whether the carpet ultimately inspected by the plaintiff was the same carpet that was delivered to Wagner Cartage by the defendant but the parties' Stipulated Summary of Trial Proceedings apparently resolves that issue on appeal. The stipulation shows that the parties agreed for purposes of this appeal that the portion of plaintiff's order that was delivered by the defendant to the warehouse designated by the plaintiff in Kansas City was carpet manufactured by the defendant and that the carpet ultimately delivered to the company designated by plaintiff's purchaser to do the installation and that was rejected was also carpet manufactured by the defendant.

By January 2, 1969, Christopher Investment Company, plaintiff's

purchaser, had collapsed financially and had been taken over by its financier, James B. Nutter Company. Nutter was aware of Christopher's intention to purchase carpet from the plaintiff. It was also aware that the carpet was stored in the bonded warehouse. Both Christopher and Nutter paid part of the storage charges. Nutter gave the plaintiff assurances that it would honor the Christopher contract, and would pay for the carpet as soon as it was cut and laid at the apartment project site. On or about January 2, 1969, Nutter indicated to the plaintiff that it was ready to receive the carpet. Plaintiff therefore arranged for the carpet to be moved from Wagner Cartage to Lay-Rite Carpet Company, which company was employed by Nutter to cut the carpet and to install it in the apartment complex. Employees of Lay-Rite inspected several rolls of the carpet, but were unable to find 23 feet of carpet that matched so as to lay carpet in one display apartment. Lay-Rite informed Nutter, who also inspected the carpet. Nutter rejected the carpet and refused to pay to the plaintiff the purchase price of $10,791.10. Plaintiff then informed the defendant that it, too, rejected the carpet. After the exchange of some correspondence, this action was filed August 1, 1969. In its supplemental memorandum opinion filed September 10, 1973, the trial court found in favor of the plaintiff in the amount of $11,805.44 plus the costs of the action, less a $202 judgment in favor of the defendant against the plaintiff. The court directed that judgment be entered against the defendant after applying funds on hand from the court-ordered sale of the carpet on November 17, 1971 (amounting to $2,944) and the $202 judgment in favor of the defendant. It is from that judgment of $8,659.44 plus costs that the defendant appeals.

The district court made numerous findings of fact and conclusions of law upon which it based its ruling. It found that the carpet in question was part of a 12,000 yard order by plaintiff accepted by the defendant's letter of May 29, 1967. That letter fixed the price of the carpet at "$2.80 yard F. O. B. Mill", "25 oz. face weight—100% acrylic cut pile", "Carpet will be 1st quality (no seconds)." The court further found that delivery was to be made on defendant's truck in 9,000 yard lots at six cents per square yard at either Kansas City, Missouri or Lawrence, Kansas. The court found that the shipment in question was made on defendant's truck to Wagner Cartage Service, a bonded warehouse, as prearranged. The shipment, the court found, included 45 rolls of carpet, 9 of which were reshipped to a Lawrence warehouse. The

court found that the 21 rolls complained of in this action were moved from Wagner to Lay-Rite Carpet for cutting for plaintiff's purchaser. The court determined that Lay-Rite examined three or four 100-foot rolls in an attempt to get a piece 23 feet long that would match in order to lay carpet in a "show" apartment. Lay-Rite, the trial court found, considered the carpet defective in that it was extensively patched, delaminated in places, and was not 25 oz. face weight. Lay-Rite's owner, the court stated, opined that some damage had resulted from storage, but that this was limited to only the outer four or five feet of some of the rolls. The court found that an independent company inspected the carpet on February 11, 1969 for the defendant and made substantially similar findings to those of Lay-Rite.

The court concluded that the plaintiff showed that 21 rolls shipped by the defendant was the same carpet handled and inspected as set forth above. The court also concluded that the defendant had been advised that the carpet would be stored in a bonded warehouse due to a building trades strike to await plaintiff's purchaser's requirements and that therefore plaintiff's inspection at the time of cutting for installation was not unreasonable. The court ruled that the carpet was not in conformity with the specifications of plaintiff's order, of which the defendant was seasonably notified by the plaintiff as provided by K. S. A. 84-2-602.

Defendant's brief is divided into four parts, with each part having several divisions, but when boiled down the defendant's theory of the case is this: that plaintiff's argument is based upon the unsupported assumption that since the carpet was undisputedly nonconforming when it was removed from the warehouse, the carpet must have been nonconforming when it was delivered; that there is no direct evidence that the carpet did not conform to the contract specifications at the time of delivery to the warehouse, and thus it must be deemed to have presumptively conformed to the contract; but that even if all that the plaintiff says is true, plaintiff's action was unreasonable and amounted to commercial bad faith in that it failed to make a timely inspection of the carpet, thereby effectively depriving the defendant of any opportunity to invoke its statutory right to cure the nonconformity.

Defendant's first complaint is that there is no substantial competent evidence to support the trial court's finding that the shipment of carpet in question was nonconforming with contract specifications at the time and place of delivery. Defendant argues

that the greater weight of the evidence indicates that the carpet was damaged in transit or in storage during the time that the plaintiff delayed inspection.

That the defendant contends that evidence should be required proving nonconformity at all is surprising in view of the stipulation entered into by the parties. The parties stipulated that the portion of the 12,000 yard carpet order delivered by the defendant to the warehouse, the carpet delivered by the warehouse to Lay-Rite for cutting, and subsequently rejected, and the carpet inspected by various persons at two warehouses in Lawrence, was all manufactured by the defendant. The parties stipulated to the non-conformity of the carpet rejected by the plaintiff and further stipulated that the conformity of such carpet at the time of such rejection was not to be an issue on appeal.

As a result of the stipulation plaintiff claims that the major portion of the testimony regarding the condition of the carpet and the type of damage was eliminated from the record on appeal. Defendant claims, however, that the stipulation does not prevent it from raising the nonconformity issue since, it says, it did not stipulate that the carpet was nonconforming when *delivered* to the warehouse or that the carpet taken from the warehouse was the same carpet that was delivered to the warehouse.

Despite the fact that some of the evidence presented may not be before this court and despite the fact that the stipulation is probably not too helpful to the plaintiff, it would appear that the trial court's finding of nonconformity is supported by substantial competent evidence. Defendant challenges the finding on numerous fronts, but its attacks are not convincing. Defendant seems to feel that the basis for plaintiff's rejection was that the wrapping papers for the carpet were torn or missing, that the carpet came in inadequate roll sizes and without roll tags, and that it was discolored, damp, dirty, and rotten. Defendant argues that such nonconformity could not have occurred prior to, or during, delivery because a mill would not send out carpet in that condition and the roughest transit would not cause those results. Defendant implies that the damage must have occurred during storage while plaintiff delayed its inspection. This argument misses the point. The fact is that the nonconformity that caused plaintiff's rejection was that the carpet was of varying texture, the colors were different, the dye lots were unmatched, the rolls varied up to six inches in width, the carpet was not first quality, and it was nylon instead of 100%

acrylic. By their very nature, these are not the type of defects that are caused by improper handling and storage or by the length of the interval between storage and inspection.

Next, defendant alleges that when Lay-Rite attempted to pick up the carpet to begin cutting, the carpet was wet and that after cutting into 3 or 4 rolls, Lay-Rite rejected it as unusable. Again defendant implies that the carpet was rejected because it was wet, a condition that must have occurred during storage. The carpet *was* wet when Lay-Rite initially attempted to pick it up for cutting. Lay-Rite returned four days later, however, and picked up the carpet after it had dried. At that point it cut into 3 or 4 rolls and found the carpet to be of varying texture, unmatched dye lots, patched, and of varying widths. It was at that point and for those reasons that the carpet was rejected.

Defendant contends that its production manager, Fletcher, inspected the carpet as it came through the production line and that it met the contract specifications. Impliedly, the carpet was not nonconforming after manufacture. But the facts are that Fletcher left his job as production manager between the time that the order was accepted and before it was completed and shipped. While the carpet he viewed during manufacture was good quality, the carpet in question was among the last 3,000 yards of a 12,000 yard order and Fletcher may not have inspected this carpet. Fletcher stated that he received no complaint following delivery, though he said he normally receives any complaints within 60 days. Impliedly, the carpet was all right at that point and only became nonconforming during storage. Nevertheless, Fletcher did concede that there is no set time for inspection and that the standard of the industry is that the purchaser has the option not to inspect the carpet until he decides to sell it. Further, Lay-Rite's representative, Jackson, noted that it is a common industry practice on receiving an order as large as 21 rolls, to simply stack the carpet until it is ready for use, rather than unroll it upon delivery. Jackson did say that he would have checked it earlier than did the plaintiff, but it would appear that plaintiff did inspect the carpet when it was ready for use, in line with industry practice. Admittedly that occasion did not occur until more than nine months after delivery to the warehouse, but defendant was aware of the construction strike and of the storage, and should have been aware that plaintiff's inspection would be delayed accordingly.

Finally, Fletcher stated that he inspected the carpet in storage

and opined that it was Lewis carpet, but he could not tell if it was part of the April, 1968 shipment. Fletcher readily agreed that all the carpet he viewed had defendant's name and nylon tags on it and was specifically milled by the defendant for the plaintiff. The question is not, or at least should not be, whether every one of the 21 rolls rejected was initially part of the order No. 1644 delivered April 26, 1968 to the warehouse. A total of 45 rolls, filling four separate orders by plaintiff and all manufactured by the defendant, arrived April 26, 1968 at the warehouse. Twenty-one of these rolls were eventually shipped to plaintiff's purchaser and were rejected. Whether the 21 rolls picked up by Lay-Rite were the same 21 rolls initially part of order No. 1644 is not really significant since all of the carpet was manufactured by the defendant, supposedly to the same specifications, and the rejected carpet was admittedly nonconforming. There is substantial competent evidence to support the findings of the trial court that the carpet sold and delivered by the defendant to plaintiff during 1968 was nonconforming with contract specifications at the time and place of delivery.

Having disposed of the nonconformity issue, it is now necessary to turn to what, by stipulation, was supposed to be the sole issue on appeal. That is: Notwithstanding the carpet's nonconformity, was plaintiff's rejection, or revocation of its acceptance of the same, timely?

Appellant relies heavily on *Cervitor Kitchens v. Chapman,* 7 Wn. App. 520, 500 P. 2d 783, in support of its position that plaintiff's delayed inspection was unreasonable as a matter of law. That case sets forth the rule to be applied to determine whether the question of rejection within a reasonable time is one of fact or of law:

"If the facts are disputed, the question of what is a reasonable time is for the trier of the fact. . . .

"If the facts are undisputed concerning the duration of the time for inspection, the question of whether the goods were retained for an unreasonable time becomes one for the court to decide. . . ." (pp. 522, 523.) *Kleeb v. Long-Bell Lumber Co.,* 27 Wash. 648, 68 Pac. 202; *Beco, Inc. v. Minnechaug Golf Course, Inc.,* 5 Conn. Cir. Ct. 444, 256 A. 2d 522.

See, also, 2 Anderson, Uniform Commercial Code, § 2-513:14, p. 134.

Defendant contends that a failure by plaintiff to inspect is only justified where such inspection is wholly impracticable, not just inconvenient or time-consuming and thus it argues that the plaintiff had a reasonable opportunity to inspect and that its failure to do so

amounts to acceptance under K. S. A. 84-2-606. *Cervitor*, supra, at p. 524.

*Cervitor* was a case in which a plumbing contractor, Chapman, was working on the construction of a college dormitory. Chapman purchased from Cervitor Kitchens, Inc., a merchandising business, four kitchen units to be installed in a dormitory. On May 4, 1967, Chapman received from Cervitor four kitchen units enclosed in shipping crates or cartons. Chapman did not inspect the units on delivery, although Chapman's manager was present when the units arrived and noticed some minor exterior shipping damage on two of the crates. The units remained in their shipping crates and were stored in a separate room at the dormitory then under construction. No inspection was made of the units until shortly before installation on or about August 5, 1967. A few days later Chapman notified the engineer that the units had been installed. Somewhat later the engineer informed Chapman that the units were of poor quality and did not comply with specifications. Chapman in turn notified Cervitor that the units did not comply with the specifications and would be rejected. Chapman shipped the units to Cervitor, who refused them. They were later sold for storage charges. The sole question in *Cervitor* was whether Chapman was deemed to have accepted the four kitchen units because of his failure to inspect and reject them for a period of approximately three months after delivery and because of his installation of the units without prior inspection and rejection. Cervitor contended that Chapman waited too long to inspect and reject the units, and his installation of the units without inspection further precluded him from rejecting them. The Washington Court of Appeals, with one dissent, agreed with both contentions. Not noted in defendant's brief, however, is the Washington Supreme Court's reversal of the intermediate appellate court as to Cervitor's first point, that is, that Chapman's inspection was not timely. The Washington Supreme Court in *Cervitor Kitchens, Inc. v. Chapman* [*Cervitor* II], 82 Wn. 2d 673, 513 P. 2d 25, stated:

". . . We . . . cannot agree with the Court of Appeals that, as a matter of law, the 3-month time delay in failing to inspect and accept or reject the goods constituted an acceptance." (p. 676.)

The dissent in the appeals court decision had noted that there was evidence that suppliers that deal in commercial fixtures such as these units recognize that their merchandise will frequently be stored on job sites and that when delivery is made, the purchasers

may not be ready to install the units immediately. *Cervitor* I, supra, p. 526. The supreme court's opinion also noted this testimony and concluded that the trial court's finding that the units were timely inspected was supported by substantial competent evidence in the record. *Cervitor* II, supra, p. 678. The supreme court did, however, affirm the appeals court's ruling that Chapman's *installation* of the units without inspection after over 3 months' delay was inconsistent with the seller's ownership as a matter of law and amounted to acceptance where the deficiencies claimed were readily apparent upon inspection after the units were taken from the crates and before installation. *Cervitor* II, supra, p. 676.

Applying *Cervitor* II to the facts of this case it would seem that it cannot be said that plaintiff's nine-month delay in inspecting and accepting or rejecting the carpet is itself an acceptance as a matter of law, but rather should be left to the trier of fact. As in *Cervitor* II there was evidence in the instant case that the defendant was aware that plaintiff's purchaser was not ready to use the goods it shipped (because of the construction strike) and that it was aware that the goods were to be shipped to a warehouse for storage. There was also evidence that no set time for inspection exists but that the industry practice is not to inspect until a purchaser is found and is ready to use the goods. There was further evidence that the carpet, when received in a large order such as this one, is stocked until ready for use rather than unrolled for inspection of concealed defects. Under all the evidence the carpet was timely and reasonably inspected and the trial court's finding to that effect is supported by substantial competent evidence.

There is a further question, however, whether or not the acts of the carpet installer for plaintiff's purchaser, Lay-Rite, were so inconsistent with the seller's ownership as to amount to the exercise of ownership and dominion by the plaintiff thereby constituting acceptance.

Once again applying *Cervitor* II to the facts of this case, it would appear that the actions of the installer for plaintiff's purchaser were not inconsistent with seller's ownership and could not be said to amount to acceptance as a matter of law. In *Cervitor* there was no evidence that installation of the units was necessary to enable a proper inspection to take place, particularly where the deficiencies complained of were readily apparent upon inspection after the units were taken from the crates and before installation. In the instant case there would appear to be evidence that it was

necessary to unroll and cut into three or four rolls of carpet in order to determine that the carpet was extensively patched, was delaminated in places, that it varied in width and in hue, and that it was not 25 oz. face weight. That is analogous to the uncrating of the units in *Cervitor*. After unrolling three or four rolls of carpet it became obvious that the carpet was defective since Lay-Rite could not find 23 feet in the several hundred feet of carpet that would match for installation in a "show" apartment. Had Lay-Rite installed the carpet in the "show" apartment or other apartments before rejecting it, *Cervitor* II might be in point. Here, however, the deficiencies complained of were readily apparent upon inspection after the carpet was unrolled, and rejection preceded installation. It cannot be said that the unrolling and cutting of the carpet in an attempt to match portions for installation was inconsistent with the seller's ownership as a matter of law so as to constitute an acceptance of the carpet.

Defendant contends that because of plaintiff's unreasonable and untimely conduct, it was deprived of its statutory right to cure under K. S. A. 84-2-508 (1). The fact is that the contract made no provision for a time for performance, and since it could not therefore have expired by the time of plaintiff's rejection, defendant could have offered to cure at that time. It did not. Defendant's cry that it was deprived of this opportunity has a somewhat hollow ring. Additionally, defendant claims it was deprived of sufficiently prompt notice of damage to be able to invoke its right of inspection, right to ascertain the facts, and right to preserve evidence under K. S. A. 84-2-515. Defendant did have two inspections of the carpet, and it was not prejudiced in this regard.

Finally, defendant argues that the trial court erred in awarding damages for freight, storage and handling charges, for prejudgment interest on the purchase price, and for loss of profits. Defendant contends that the evidence does not support this award.

A buyer's remedies and the damages recoverable are controlled by K. S. A. 84-2-711, 713 and 715 which provide in applicable part that:

84-2-711. "(1) Where the . . . buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (section 84-2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid

"(*a*) 'cover' . . . or

"(*b*) recover damages for nondelivery as provided in this article (section 84-2-713)."

84-2-713. "(1) Subject to the provisions of this article with respect to proof of market price (section 84-2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price *together with any incidental and consequential damages provided in this article* (section 84-2-715), but less expenses saved in consequence of the seller's breach." (Emphasis supplied.)

84-2-715. "(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(*a*) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . ."

The official U. C. C. Comment following the latter section is enlightening. It says:

"6. In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within the meaning of subsection (2) (a)."

Section 84-2-715 has been construed by the text writers to include loss of profits. Bender's U. C. C. Service, Duesenberg-King, 3A Sales & Bulk Transfers § 14.07 [2]; Anderson's U. C. C., 1970-1974, Cumulative Supplement, § 2-715:8, p. 695; 67 Am. Jur. 2d, Sales, § 696, *et seq.*; and see 78 C. J. S. Sales § 550c and 17 ALR 3d 1010, 1117, Uniform Commercial Code—Sales, § 46, and 1975 Supp.

These sections do not materially change the remedies available in this state to the aggrieved party upon breach of contract. The U. C. C. reflects the familiar doctrine of *Hadley v. Baxendale,* 9 Exch. 341 (1854). Ordinarily a party's damages for breach of contract are limited to those which may fairly be considered as arising in the usual course of things from the breach itself, or as may reasonably be assumed to have been within the contemplation of the parties as the probable result of such a breach. *Whiteley v. O'Dell,* 219 Kan. 314, 548 P. 2d 798. The burden is upon the party claiming damages to support his claim with evidence demonstrating his loss with reasonable certainty. Such evidence must provide the trier of fact with a reasonable basis upon which to arrive at an award. *Venable v. Import Volkswagen,*

*Inc.,* 214 Kan. 43, 50, 519 P. 2d 667. Loss of profits has been recognized as an element of consequential damages under the cited sections of the U. C. C. *Hoefferle Truck Sales v. Divco-Wayne,* 523 F. 2d 543; *Texsun Feed Yards, Inc. v. Ralston Purina Company,* 447 F. 2d 660, 668; *Lewis v. Mobil Oil Corporation,* 438 F. 2d 500, 507, 510; *Gulf Chem. & Metallurgical v. Sylvan Chem.,* 122 N. J. Super. 499, 300 A. 2d 878, 882, Aff'd, 126 N. J. Super. 261, 314 A. 2d 73.

The trial court specified the items of damages allowed with particularity. These were the freight from Kansas City to Lawrence and the storage there following discovery of nonconformity, the handling charges of Lay-Rite, anticipated profits of $2,080.52, the $8,527.62 originally paid defendant by plaintiff for the 21 rolls of carpet in question, and six per cent interest upon the latter sum from date of payment, August 22, 1968. The court carefully pointed out that storage charges incurred in Kansas City (prior to discovery of nonconformity) were not allowed because that storage occurred through no fault of the defendant.

There was substantial competent evidence to support each item allowed by the trial court. Mr. Vincent, president of Pur-O-Zone Chemical, identified the statements and bills incurred. Defendant does not contend that the amount of each item was not shown by the evidence, but claims the expenses did not arise by reason of the breach. Clearly the handling, transportation and storage allowed followed and directly resulted from the breach. Plaintiff was suddenly confronted with the problem of storing a large shipment of carpeting which failed to meet specifications and was unsalable. It moved the carpet, stored it, filed suit, and awaited directions from the court in the absence of any directions from defendant.

The purchase price of the carpeting was not disputed and is shown by documentary evidence. This was a liquidated sum, and the allowance of interest thereon was proper. *Phelps Dodge Copper Products Corp. v. Alpha Construction Co.,* 203 Kan. 591, 455 P. 2d 555.

Defendant was aware that the carpet was being purchased for resale by plaintiff. Resale was clearly within the knowledge and contemplation of the parties. Plaintiff had a contract for resale with Christopher at the time the carpet was ordered. Defendant claims that Christopher's subsequent insolvency and default left plaintiff without a resale customer. Not so. Nutter, Christopher's financier, stood ready to honor the contract and authorized delivery of the

carpet for cutting and installation. The court awarded plaintiff the precise amount plaintiff would have realized from sale of the carpet had it not been for defendant's breach. There is substantial competent evidence to support the findings and judgment of the trial court.

It is readily apparent on this record that defendant filled the earlier and major portion of plaintiff's order with carpet which met the contract specifications, but that it provided inferior, substandard, nonconforming and wholly undesirable merchandise in the final shipment. The trial court quite properly held defendant responsible for the incidental and consequential damages sustained by the plaintiff and established by the evidence.

The judgment is affirmed.