**MORTGAGEAMERICA CORPORATION, Appellant,**

v.

**The AMERICAN NATIONAL BANK OF AUSTIN, Appellee.**

No. 13555.

Court of Appeals of Texas, Austin.

April 6, 1983.

Rehearing Denied June 1, 1983.

Joseph H. Hart, Robinson, Felts, Starnes & Latting, Austin, for appellant.

Douglass D. Hearne, Richard L. Crozier, Hearne, Knolle, Lewallen, Livingston & Holcomb, Austin, for appellee.

Before PHILLIPS, C.J., and POWERS and GAMMAGE, JJ.

PHILLIPS, Chief Justice.

MortgageAmerica Corporation appeals from the trial court's judgment awarding appellee American National Bank of Austin damages suffered by appellant's breach of its contract with appellee to provide appellee, acting as appellant's agent, two $500,000 Government National Mortgage Association (GNMA) certificates, which appellee had contracted to sell to the investment banking firm of Salomon Brothers on appellant's behalf.

We affirm the judgment.

In January of 1980, Joe Long, the sole owner of appellant MortgageAmerica Corporation, contacted John Tolleson, the president of appellee American National Bank of Austin, and asked Tolleson if appellee would be willing to serve as appellant's agent in the purchase and sale of GNMA certificates.[1] Such a relationship would al-

---

1. These certificates are guaranteed by the United States government and are secured by home mortgage contracts, which are themselves insured by either the Federal Housing Authority (FHA) or the Veterans Administration (VA).

Appellant MortgageAmerica Corporation purchases mobile home mortgages from mobile home dealers and groups these mortgages in "pools" of at least $500,000. After the pool has been certified by the Government National Mortgage Association, an agency of the federal government, a client bank of the United States government issues MortgageAmerica Corporation a government certificate, secured by the mobile home mortgages, which appellant is then free to sell.

low appellant to make use of appellee's substantial credit standing and, in turn, allow appellant to obtain better prices from established securities brokers in the trade of these certificates. Appellee would receive the customary $2/32$ of one percent of the trade price of the securities in return for its efforts. Appellee subsequently agreed.

During the first two months of 1980, appellee, acting as appellant's agent, purchased two GNMA certificates worth more than $2,500,000 for appellant. Both transactions were successfully completed.

In early March of 1980, George Aubin, appellant MortgageAmerica's president, contacted Bill Raymond, a vice-president of the investment banking firm of Salomon Brothers, and asked if Salomon Brothers would be interested in purchasing two $500,000 GNMA certificates; one to be delivered in mid-June, the other in mid-July. Raymond told Aubin that Salomon Brothers was interested in purchasing the securities, but that he could not deal directly with appellant because appellant did not have sufficient capitalization to meet Salomon Brothers trading partner requirements. Raymond suggested that Aubin use a bank with sufficient capital resources as an agent for the sale.

Later that same day, Aubin contacted James Jackson, a senior vice-president in charge of investment at appellee American National Bank of Austin, and asked him if appellee bank would be willing to serve as appellant's agent in the sale to Salomon Brothers of the two GNMA certificates. Aubin explained that the details of the trade had already been negotiated and that appellee would serve merely as the conduit of the trade. Jackson told Aubin that he would have to check into the matter before he could commit appellee. Upon calling Raymond at Salomon Brothers, Jackson confirmed the details Aubin had previously explained. Jackson then called Aubin's office and left a message with a "female voice" that appellee would serve as appel-

lant's agent in the sale of the two GNMA certificates to Salomon Brothers.

Approximately four months later, on June 4, 1980, Jackson called Aubin for details on the GNMA certificates appellee had contracted to deliver to Salomon Brothers in mid-June and mid-July. Aubin not being in his office, Jackson's call was transferred to Raymond Peyre-Ferry, an assistant secretary of appellant MortgageAmerica Corporation. Peyre-Ferry was responsible, among other things, for keeping the records of appellant's trading of GNMA certificates. Peyre-Ferry told Jackson that he was unfamiliar with the trade, but that he would check his records for the desired information. Upon examining appellant's records, he discovered two mortgage pools which had been already assigned a GNMA certificate number and upon which two certificates were soon to be issued. After being unable to contact Aubin, Peyre-Ferry decided that this was the information Jackson sought. He returned Jackson's call and gave the information on the two mortgage pools to one of Jackson's assistants. Peyre-Ferry was discharged from appellant's employment shortly thereafter.

On June 9, 1980, Jackson called Aubin for further details on the upcoming sale. Aubin told Jackson that no agreement had ever been reached in March of 1980 between the parties, and that appellant was not responsible for any contractual duties assumed by appellee to Salomon Brothers, and further, that appellant would not deliver the two GNMA certificates to appellee. Aubin immediately called Raymond at Salomon Brothers and explained the mistake. Raymond assured Aubin that Salomon Brothers was looking to appellee as "principal" in the sale and that Salomon Brothers and appellant had no contractual relationship.

The next day, June 10, 1980, Long and Aubin, representing appellant MortgageAmerica Corporation, met with Tolleson and Jackson, representing appellee Ameri-

The issuance of these certificates insure the free flow of new mortgage money throughout the United States. The money received from the certificates' sale is then reinvested in purchasing additional home mortgages, from which new certificates will be formed.

can National Bank of Austin. At this meeting, Jackson presented Long and Aubin written confirmations sent by Salomon Brothers to appellee confirming the sale of two $500,000 GNMA certificates. Long, both at the meeting and later that day by letter, denied all responsibility for the trade on appellant's behalf. Two days later on June 12, 1980, appellee responded to Long's letter by sending appellant a demand letter directing appellant to deliver to appellee the GNMA certificates so that appellee could fulfill its contractual duties with Salomon Brothers—which duties it had assumed as appellant's agent. Appellant responded by telegram ordering appellee to refrain from selling Salomon Brothers any GNMA certificates. In essence, appellant ordered appellee to breach its contract with Salomon Brothers.

Appellee, in order to meet its contractual duty to Salomon Brothers, was forced to go into the open market and purchase two GNMA certificates, which had greatly increased in value since the March contract price. Accordingly, appellee lost considerable sums of money in selling the certificates to Salomon Brothers at the lower March contract price. Appellant then sold its two $500,000 GNMA certificates, the same certificates that it had refused to deliver to appellee, for the inflated June and July market prices.

Appellee brought suit against appellant for its resulting damages and attorneys fees. Throughout the trial below, appellant claimed that appellee was not appellant's agent since there had never been a "meeting of the minds" that appellee would serve as appellant's agent in the sale of the certificates to Salomon Brothers. In answering the special issues, the jury found otherwise. Based upon the jury verdict, the trial court awarded appellee $146,282.90 as damages, and $46,271.50 as attorneys fees, as well as interest and costs.

### I.

Appellant MortgageAmerica Corporation, by its first two points of error, challenges the trial court's judgment because any alleged contract to sell the GNMA certificates was unenforceable, as a matter of law, since it was never reduced to writing in compliance with Tex.Bus. & Com.Code Ann. § 8.319 (1968); and, in any event, appellee American National Bank of Austin is not entitled to any reimbursement, as a matter of law, since it breached its fiduciary duty owed appellant. Because of their logical interrelation, we shall address the two points together.

■ At the outset, we must point out that the transaction which forms the heart of this lawsuit is actually two separate contracts. The first embodies the relationship between appellant and appellee. This contract was for the sale of appellant's GNMA certificates by appellee acting as appellant's agent. This contract, in essence, is one of agency; as such, it does not have to be in writing to be enforced. Such a contract is without the provisions of the statute of frauds embodied in Tex.Bus. & Com.Code Ann. § 8.319 (1968). *E.F. Hutton v. Zaferson,* 509 S.W.2d 950 (Tex.Civ.App.1974, writ ref'd n.r.e.). *See* U.C.C. § 8–319 Comment 4 (1978).

The second contract is between appellee, acting as appellant's agent, and Salomon Brothers for the sale of two $500,000 GNMA certificates. Appellant contends that this contract was unenforceable because the parties failed to comply with Tex. Bus. & Com.Code Ann. § 8.319 (1968). Accordingly, appellant contends that appellee was not bound to sell Salomon Brothers any GNMA certificates, and therefore, any resulting damages were incurred by appellee acting against the express orders of appellant and for its own motives and not as a result of its acting as appellant's agent.

■ Texas Bus. & Com.Code Ann. § 8.319 (1968) states:

A contract for the sale of securities is not enforceable by way of action or defense unless

(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a con-

tract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(2) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

(3) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under Subdivision (1) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(4) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

Initially, we note that GNMA certificates are securities as defined by Tex.Bus. & Com.Code Ann. § 8.102 (1968), and accordingly, under the mandate of Tex.Bus. & Com.Code Ann. § 8.319 (1968), an agreement concerning their sale must be reduced to writing to be enforceable. *First National Bank of Chicago v. Jefferson Mortgage Co.,* 576 F.2d 479 (3rd Cir.1978); *Lehman Govt. Securities, Inc. v. Commercial Mortgage Co.,* 16 UCC Rep. 1117 (N.Y.1975).

■ The evidence presented in the case at bar shows that Salomon Brothers sent written confirmations of the contracted sale to appellee in May of 1980. These written "committal letters" reflected the basic terms initially agreed to in early March by Aubin, representing appellant, and Raymond, representing Salomon Brothers. These written confirmations are sufficient under Tex.Bus. & Com.Code Ann. § 8.319(3) (1968) to satisfy the statute of frauds, and accordingly, make the contracted sale between appellee and Salomon Brothers enforceable.

Appellant next contends that even if the "committal letters" satisfy the general requirement of § 8.319 § (3), this provision contemplates the receipt of the confirmation within a "reasonable time," and that the "committal letters" receipt in May, three months after the initial oral agreement, was unreasonable as a matter of law. Because of this appellant contends that the contract was unenforceable; as such, any damages incurred by appellee in performing the unenforceable contract were not recoverable.

■ Texas Bus. & Com.Code Ann. § 1.204(b) (1968) states, "[w]hat is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." Accordingly, it is universally held under the Uniform Commercial Code that the "reasonableness" in timely taking an action—such as sending a confirmation ·under § 8.319(3)—when it is a matter of dispute as in this case, is a question of fact to be determined by the fact finder. *Gigandet v. Third Nat. Bank of Nashville, Tenn.,* 333 So.2d 557 (Ala.1976); *La Villa Fair v. Lewis Carpet Mills, Inc.,* 219 Kan. 395, 548 P.2d 825 (Kan.1976); *Mott Equity Elevator v. Svihovec,* 236 N.W.2d 900 (N.D. 1975); *Valley Bank & Trust Co. v. Gerber,* 526 P.2d 1121 (Utah 1974); *Barron v. Edwards,* 45 Mich.App. 210, 206 N.W.2d 508 (Mich.1973).[2]

■ It appears in reviewing the record that appellant failed to request any special issue on the "reasonableness" of the receipt of the confirmation, and that, the trial court did not otherwise submit such an issue. Therefore, it appears that no fact finding was made in the trial court on whether the receipt of the "committal letters" was reasonably timely or not. We are ever mindful that we have no power to make determinations of disputed facts in our appellate review. We are merely limited to hold facts as found when matters are not disputed and established as a matter of

**2.** The use of another State's jurisprudence in interpreting the Uniform Commercial Code— which the Tex.Bus. & Com.Code virtually is—is not only necessary because of the lack of Texas precedent, but is also encouraged by the drafters of the Code. *See* UCC § 1–102(1), (2)(c) (1978).

law in the trial court below. *City of Beaumont v. Graham,* 441 S.W.2d 829 (Tex.1969); *Mooers v. Richardson Petroleum Co.,* 146 Tex. 174, 204 S.W.2d 606 (Tex.1947); *Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73 (1939).

■ Since appellant failed to request such an issue, and it was not otherwise found by the fact finder; and since it was a matter of dispute below, and we have no such authority to find disputed facts, as they are solely in the province of the jury; we hold that appellant may not now complain to this Court of the "reasonableness" of the timely receipt of the confirmations of the sale sent by Salomon Brothers to appellee.

Appellant also contends that appellee may not now recover damages from appellant because the damages incurred by appellee were the result of appellee's breach of its fiduciary duties when it consummated the sale of the securities with Salomon Brothers after being instructed not to do so by appellant.

■ At the outset, we must note that the trial court awarded appellee its damages based upon a jury verdict finding that appellee suffered its damages as a direct result of dutifully following appellant's instructions. The evidence presented below shows that appellee became contractually liable to Salomon Brothers to deliver two $500,000 GNMA certificates on appellant's express request. The evidence also shows that appellee was forced to purchase, at great expense, similar certificates to deliver to Salomon Brothers at a net loss when appellant refused to deliver its promised certificates, which certificates were shown to have then been sold by appellant at a considerable profit.

■ Having found appellee contractually liable for the certificates' delivery to Salomon Brothers, we hold that appellee breached no fiduciary duty to appellant. The rule is clear that if in the performance of an agent's duties for his or her principal, the agent incurs liability for performing an act not "morally wrong," the agent may have

indemnity from the principal for any loss proximately resulting from the good faith execution of the terms of the agency. *Oats v. Dublin Natl. Bank,* 127 Tex. 2, 90 S.W.2d 824, 829 (Tex.1936); *Hancock v. Stacy,* 103 Tex. 219, 125 S.W. 884, 887 (Tex.1910); *Modine Mfg. Co. v. North East Ind. Sch. Dist.,* 503 S.W.2d 833 (Tex.Civ.App.1973, writ ref'd n.r.e.); *Minnesota Mutual Life Ins. Co. v. Weeks,* 408 S.W.2d 128 (Tex.Civ. App.1966, no writ).

The Restatement (Second) of Agency § 438(2)(b) (1958) states:

> (2) In the absence of terms to the contrary in the agreement of employment, the principal has a duty to indemnify the agent where the agent
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (b) suffers a loss which, because of their relation, it is fair that the principal should bear.

We hold, in applying the wisdom of the drafters of the Restatement with the prior decisions of this State to the clear facts of this case, that it is only fair and just that appellee recover its damages incurred while serving as appellant's agent. *See also* Restatement (Second) of Agency § 438 comment (f) and § 455(a) (1958).

II.

Appellant next complains that the trial court erred in admitting into evidence a memorandum drafted by Aubin on June 10, 1980, setting forth all of the facts of the transaction as known by Aubin. Appellant objects that the memorandum was privileged by the attorney-client privilege, and therefore, inadmissible.

■ The basic purpose of the attorney-client privilege is to secure the free flow of information between an attorney and his or her client on matters involved in litigation without the fear that such details of their communication will be disclosed. *West v. Solito,* 563 S.W.2d 240 (Tex.1978); *Hyman v. Grant,* 102 Tex. 50, 112 S.W. 1042 (Tex.1908). It is generally held that such privilege extends only to those disclosures relevant to the litigation made by the client

to retained counsel or made in order to obtain legal counsel and advice. *U.S. v. Kasmir,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (authorities therein); *Stallings v. Hullum,* 79 Tex. 421, 15 S.W. 677 (Tex.1891); *Hyman v. Grant, supra; Ballard v. Ballard,* 296 S.W.2d 811 (Tex.Civ. App.1957, no writ) (cited with approval by the Supreme Court in *West v. Solito, supra* at 245). In the case at bar, Aubin, representing appellant, drafted the memorandum before counsel had been retained and *not* for the purpose of obtaining counsel or legal advice.

Despite appellant's implied contentions, the mere delivery of a pre-existing document to an attorney does not invoke the attorney-client privilege. *U.S. v. White,* 326 F.Supp. 459 (S.D.Tex.1971), aff'd, 487 F.2d 1335 (5th Cir.1973), *cert. denied,* 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). This pre-existing memorandum, created outside the attorney-client privilege, is not automatically privileged unless it is otherwise privileged by the workings of common law. *U.S. v. Davis,* 636 F.2d 1028 (5th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981); *Falsone v. U.S.,* 205 F.2d 734 (5th Cir.1953). In examining the memorandum, we hold that it is not otherwise privileged.

The memorandum is merely a compilation of facts drafted by Aubin after an alleged telephone communication with Jackson on or about June 9, 1980. All of the pertinent facts of the memorandum were independently developed by both parties in the proceedings had below. We fail to see how the memorandum, assuming that appellant had met his burden of proof to show that it was privileged, harmed appellant in the trial court. We are mindful that the attorney-client privilege does not extend to the disclosure of underlying facts, but merely to the disclosure of attorney-client communications. *Upjohn Co. v. U.S.,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Accordingly, since the underlying facts had been independently presented, the admittance of the memorandum which merely recited these facts, could not have "amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the cause." Tex.R.Civ.P.Ann. 434 (1981).

Appellant also contends that the trial court made an improper comment on the weight of the evidence when it admitted the memorandum into evidence. The following exchange was had between the trial court and counsel:

*Mr. Malone* (appellant's counsel): Your Honor, we object to the admission of Plaintiff's exhibit 6 into evidence (memorandum) on the basis it is irrelevant, immaterial, it is hearsay and it is privileged in the attorney-client privilege.

*The Court:* The Supreme Court said last week it wasn't privileged.

*Mr. Malone:* We renew our position that it is, Your Honor.

*The Court:* I'm not going to go against the Supreme Court. They sustain me. So, I'll receive it in evidence.

In this exchange the Court was referring to the Supreme Court's refusal to earlier grant appellant's motion for leave to file for writ of mandamus to overturn the trial court's pre-trial order compelling appellant to produce the memorandum during pretrial discovery.

In reviewing the record, we find that no objection was levied by appellant to the trial court's alleged comment on the weight of the evidence. The general rule is that "an objection to improper conduct or comment on the part of the court in the trial of the case generally must be made at the time of the occurrence if the error is to be preserved for appellate review unless the conduct or comment is of a character that cannot be rendered harmless by proper instruction. (authorities omitted)." *State v. Wilemon,* 393 S.W.2d 816, 818 (Tex.1965); see also *City of Austin v. Cook,* 343 S.W.2d 545 (Tex.Civ.App.1961, writ ref'd n.r.e.). This objection is required so that the trial court may correct his or her own errors without the need of the redress of the ap-

pellate process. *Lewis v. Texas Employers' Ins. Ass'n.*, 151 Tex. 95, 246 S.W.2d 599 (Tex.1952).

Assuming such comment was error, we hold that the trial court's comment, while serving absolutely no purpose in the presentation of the facts of the case to the jury, was not such error that could not have been cured by an instruction, if properly requested. Appellant, having failed to do so, waived any right to complain of such error to this Court.

### III.

Appellant lastly complains that the trial court erred in refusing to allow appellant to introduce a sixteen page proposed draft of the "Statement of Uniform Practice for the Clearance and Settlement of Mortgage-Backed Securities" into evidence. Appellant attempted to show a "usage of trade" in the securities industry by the offered exhibit.

The existence of an industry-wide "usage of trade" is a fact question to be determined by the fact finder, Tex.Bus. & Com.Code Ann. § 1.205(b) (1968), and the burden of so proving is on the party seeking to prove its existence and scope.[3]

In appellee's, as plaintiff below, request for admissions, the appellant admitted, by operation of the trial court order deeming the requests admitted, that the "statement" was (1) merely a discussion draft of proposed guidelines distributed at a securities seminar in 1979, (2) that such guidelines had *never* been adopted by *any* association of dealers in mortgage-backed securities, and (3) that such guidelines had *never* been adopted by *any* regulatory agency with jurisdiction over mortgage-backed securities. The evidence presented below also shows that appellee did not follow and was not bound to follow the proposed "guidelines."

Accordingly, we hold that appellant failed to prove the existence of any "usage

of trade" as embodied in its offered exhibit, and therefore, the trial court was correct in denying its admittance.

All appellant's points of error having been overruled, we affirm the judgment of the trial court.

[POWERS, J., not participating]

---

**3.** *Canal Ins. Co. v. Thornton*, 279 F.2d 41 (5th Cir.1960); *Peterson v. McCarney*, 254 N.W.2d 438 (N.D.1977); *Western State Bank v. First Union Bank*, 172 Ind.App. 321, 360 N.E.2d 254 (Ind.App.1977); *Eastern Associates, Inc. v. Sarubin*, 274 Md. 378, 336 A.2d 765 (Md.1975).