LUCERO, Circuit Judge,
concurring in part and dissenting in part.
I agree with my respected colleagues that Rafter Seven Ranches accepted the first sprinkler system and used it in an attempt to mitigate its damages.[1] But I cannot accept that by leaving sprinkler parts in Rafter Seven’s field in September, Ochs “delivered” the second and third systems. Were we to assume delivery, as the majority does, a “reasonable opportunity to inspect” includes the ability to test, which Rafter Seven never had during the six weeks before it notified Brown on November 1. Because the majority applies an unduly inflexible view of the U.C.C. that misapprehends the realities of this transaction, I respectfully dissent.
I
Let us be clear on what happened. As early as 2000, Ochs was promoting sprinkler systems to Rafter Seven and asked for and received “down payments” totaling about $25,000 for generators and nozzle packages to be part of a later sprinkler delivery. In April 2001, after Rafter Seven discouraged Ochs because it could not afford the complete systems, Ochs arranged for Friesen to meet with Brown. Under the terms of the lease agreements with Brown, Ochs was to supply Rafter Seven with four functional sprinkler systems around May 2001, in time for the planting season. The leases specified the manufacturer, model, and serial number of each sprinkler system. The “Delivery and Acceptance” clause of each Brown lease allowed Rafter Seven to certify that the equipment was “delivered, inspected, installed, ... in good working condition, and ... accepted by [Rafter Seven] as satisfactory” before approving Brown’s payment to Ochs. Rafter Seven signed these clauses at the same time the leases were signed— a time when all parties knew the equipment was undelivered. This fiction allowed Brown to pay Ochs immediately, thus enabling the nearly contemporaneous acquisition and delivery of the sprinkler systems. Yet, the first sprinkler system was not delivered until sometime in July. Apparently, Rafter Seven was expected to pray for rain in the interim.
Although it is undisputed that the first system was woefully inadequate, Rafter Seven had no alternative but to use it in an *1028 attempt to salvage some of its crop. As for the other three systems, the record is unimpeachable: Ochs never delivered any other complete sprinkler systems in working condition.
When Ochs attempted to deliver a second and third system apparently as late as mid-September — at or near the end of the growing season — Friesen immediately recognized that the equipment was incomplete and did not match the serial numbers or specifications in the lease agreements. He pronounced it “junk” and asked Ochs’ delivery men to remove it. When they did not, Friesen decided to make the best of a bad situation by waiting to see if they would complete the installation so that the sprinklers sufficiently conformed to the terms of each lease. He awaited delivery of numerous missing and replacement parts. They never came. Now Rafter Seven is in bankruptcy, Ochs has Brown’s $80,000, and Brown is attempting to recover lease payments from Rafter Seven for equipment that Ochs never supplied.
II
A
Engaging in analytical hopscotch, the majority skips to inspection without passing delivery. As the “Delivery and Acceptance” clause of each leases shows, all parties contemplated specific sprinkler systems delivered in good working condition. Such certifications are ordinarily signed at or after delivery. See, e.g., Old Kent Leasing Servs. Corp. v. McEwan, 38 S.W.3d 220, 224-25 (Tex.App.2001); Eaglefunding Capital Corp. v. Kamar, No. 011928, 2002 WL 1020663, at *1-2 (Mass.Super.Ct. April 17, 2002). Because Rafter Seven signed this clause before delivery — otherwise, Ochs would have been unable to acquire the equipment — it lost the ability to withhold payment from Ochs for unsatisfactory equipment. Nonetheless, the clause informs our understanding of the terms of the leases: installation of the sprinkler systems was part and parcel of the supplier’s performance and, necessarily, a prerequisite to inspection. The majority assumes delivery occurred, Maj. Op. at 1200-01, a fatal oversight I cannot condone.
The idea that delivery is not effected willy-nilly any time a supplier dumps some parts on a lessee is hardly revolutionary. In Moses v. Newman, 658 S.W.2d 119 (Tenn.Ct.App.1983), cited by the majority, a buyer purchased a mobile home that was later destroyed by a windstorm before the seller had completed installing it. Id. at 120. Despite the fact that the buyer had made multiple trips to see the house before purchasing it, and despite the fact that he had placed personal items in the trailer, the court held that the buyer had not yet had a reasonable opportunity to inspect it largely because the seller had contracted for delivery and installation, and “the seller had not completed the contracted installation at the time of loss.” Id. at 121-22; see also Davis v. Vintage Enters., Inc., 23 N.C.App. 581, 209 S.E.2d 824, 828-29 (1974).
My colleagues imply that because “Rafter Seven left the sprinklers sitting in the field,” Maj. Op. at 1201; see also id. at 1200-01, it somehow accepted a delivery. This is plainly contrary to Wyoming law. Rafter Seven, which had refused installation of the sprinklers after declaring them junk, did not bear the burden of removing them from its property. With language that could just as easily apply to the present case, the Wyoming Supreme Court has held:
When [the buyer] told [the seller] that the machine was not workable without modifications, that can mean nothing else than that the machine which was delivered to the [buyer] was not successful, and hence the condition of a sale, if there was a sale, was not fulfilled. It is *1029 difficult to see what further notice of the lack of success of the machine could have been given. As already indicated, if [the seller] did not then want the [buyer] to retain possession, there was nothing at that time, or at any time thereafter, to prevent him from taking it back. The fact that it remained in [the buyerj’s possession was [the sellerj’s own fault, at least as much as that of [the buyer],
Morgan v. Union Pac. R.R. Co., 346 P.2d 1071, 1077 (Wyo.1959) (emphases added).
Rafter Seven’s decision to await actual delivery is eminently reasonable. The leases each specify that lease payments “shall commence when Lessee has received Equipment which is equal to 50% of the value.” I refuse to call a pile of sprinkler parts, incapable of watering anything, valuable under this lease. For these reasons, Rafter Seven’s November 1 letter to Brown was a seasonable rejection of Ochs’ ineffective delivery.
B
The majority concludes that Rafter Seven’s obligation to Brown is independent of Ochs’ failure. Does the Uniform Commercial Code really leave a lessee in Rafter Seven’s position to be so rooked without recourse? In my view, the answer is “no.” Wyoming law is unambiguous in requiring that a lessee have a reasonable opportunity to inspect goods. See Wyo. Stat. Ann. § 34.1-2.A-515(a). As the majority recognizes, precedent requires that the opportunity to inspect must include a reasonable opportunity to test, and that reasonableness must be determined by the facts and circumstances of a particular transaction.
In asking what constitutes a “reasonable time” to inspect, we have a duty to look at the realities of the transaction rather than to simply count days.[2] Rafter Seven was in an obvious bind. If it did not allow Ochs the opportunity to deliver and install sprinkler systems in working condition, it would assuredly lose its crops. Because Rafter Seven allowed Ochs a few more weeks to complete the systems, the majority holds that it failed to seasonably reject the sprinklers. This result is particularly odd because, although Rafter rejected the goods by telling the seller, Ochs, that the sprinklers were incomplete and refusing to permit their installation in that condition, the majority holds that Rafter Seven somehow, at the same time, managed to accept the same goods with regard to the lessor (under this approach, perhaps Schrodinger’s cat could be both dead and alive at the same instant). We are not directed by the majority to a single case interpreting U.C.C. § 2A-515 to produce such an enigma, and I would not read the Code to allow this baffling and inequitable result. I therefore cannot accept that Rafter Seven, which never received delivery of the sprinklers for which it had bargained, can be said to have had an opportunity to inspect them.[3]
*1030 To bolster its conclusion that Rafter Seven took an unreasonable length of time to inspect, the majority relies on a treatise which explains the policy rationales requiring “speedy notification” of rejection. Tellingly, none of these policies are furthered by my colleagues’ disposition. For example, timely rejection gives a seller an opportunity to cure, Maj. Op. at 1202-03 (quoting James J. White & Robert S. Summers, Uniform Commercial Code § 8-3 at 445^46 (4th ed.1996)), but there is no doubt that the seller in this case — Ochs, not Brown — was unambiguously on notice that it had not delivered goods that were fit for installation and testing. The party with an opportunity to actually deliver conforming goods was therefore immediately on notice that the sprinklers it had delivered thus far were not satisfactory. See, e.g., EPN-Delaval, S.A. v. Inter-Equip, Inc., 542 F.Supp. 238, 247 (S.D.Tex.1982) (observing that the “purpose [of notice of rejection] is to inform the seller that the buyer rejects the goods in sufficient time to give the seller opportunity to cure, and to assist in minimizing the buyer’s losses”).
This remains true even if, as a technical matter, Brown, not Rafter Seven, was the “buyer” with regard to Ochs. See Midwest Precision Servs., Inc. v. PTM Indus. Corp., 887 F.2d 1128, 1132 (1st Cir.1989) (describing the role of the parties in a tripartite lease-finance arrangement). Ochs pitched the sprinklers to Rafter Seven, Ochs took its “down payments,” Ochs set up the meeting between Brown and Friesen, and Ochs was paid. It only makes sense that Rafter Seven would demand performance from Ochs, not Brown. Brown had long ago paid Ochs for the sprinklers, so it was not in a position to pressure Ochs into delivering conforming equipment.[4] Rafter Seven never received that equipment from Ochs and it never saw a penny of Brown’s money.
Moreover, this delay must be viewed in perspective: Rafter Seven was promised sprinkler systems in May. If Brown had learned of Rafter Seven’s definitive rejection in, say, early October instead of early November, it would have made little practical difference for the purposes of mitigating Brown’s losses. (Unless I am sorely mistaken, there are no farmers in Wyoming who plant crops in October for calendar year production.) Indeed, Brown received a July 10 letter informing it that Ochs failed to deliver the sprinklers, and admits that thereafter it had no idea, one way or another, whether the sprinklers were ever shipped.
There is also little likelihood that the six-week inspection period compounded Brown’s losses through “depreciation], rot[ting], or worse.... ” Maj. Op at 1202-03 (quoting White & Summers at 445^16). We are not dealing with a contract for refrigerated trucks filled with arugula, but rather one for non-fungible sprinklers. See Moses, 658 S.W.2d at 121 (“What is a reasonable opportunity varies, depending upon the type of goods involved.”); Buck *1031 eye Trophy, Inc. v. S. Bowling & Billiard Supply Co., 3 Ohio App.3d 32, 443 N.E.2d 1043, 1046 (1982) (trial court did not err in finding a 65-day delay before inspection reasonable when, among other things, the goods were “not perishable or subject to severe market fluctuations”). Brown does not dispute that the second and third sets of sprinklers not only failed to match the descriptions in the leases, they were also ancient, lacking in essential parts, and, as delivered, largely worthless. This is not a case where a lessor suffered some appreciable loss due to a few weeks’ delay or where “the entire loss from the transaction [would have been] minimized by early action.” Maj. Op. at 1202-03 (quoting White & Summers at 445-46).[5] To the contrary, the incomplete sprinklers remained on Rafter Seven’s property because no party considered them worth the expense of removing them.[6]
Ill
Meanwhile, back at the ranch, Rafter Seven did what a reasonable rancher would do under these circumstances. Let us not forget, these sprinklers were to be delivered around May 2001, in time for the planting season; tempus agrarius fugit— time flies out on the farm. When Ochs delivered an incomplete mess of sprinkler parts three to four months after tender was due, Rafter Seven, already faced with the loss of its crops, afforded the seller six more weeks for delivery and installation of a testable sprinkler system. Because such a system was never delivered, I do not see how it can be said that Rafter Seven had a reasonable opportunity to test the sprinklers. Even assuming that the sprinklers were “delivered” at all, the six weeks taken for testing was not unreasonable in the circumstances. Consequently, I cannot fathom how Rafter Seven can be liable for the lease payments at issue.

. I also agree with the majority that the bankruptcy court did not abuse its discretion by addressing the issue of timeliness.

. Even were we left to counting days, numerous courts have found seasonable rejection following inspection periods similar to, or even longer than, the period at issue here. See, e.g., Buckeye Trophy, Inc. v. S. Bowling & Billiard Supply Co., 3 Ohio App.3d 32, 443 N.E.2d 1043, 1046 (1983) (sixty-five days reasonable); GNP Commodities, Inc. v. Walsh Heffernan Co., 95 Ill.App.3d 966, 51 Ill.Dec. 245, 420 N.E.2d 659, 665 (1981) (two months reasonable); La Villa Fair v. Lewis Carpet Mills, Inc. 219 Kan. 395, 548 P.2d 825, 832 (1976) (nine months reasonable).

. I recognize that in a lease transaction, U.C.C. § 509(b), Wyo. Stat. Ann. § 34.1-2.A.509(b), requires that the lessee give notice of rejection to the lessor, not the seller. In this case, however, Rafter Seven was still attempting to prod Ochs, the only party with any power to effect the complete delivery of the second and third sprinkler systems, into fulfilling its obligations before Rafter Seven *1030 could exercise its right to test. These events were therefore prerequisite to giving the notice of rejection implicated by § 509(b).

. In fact, as the majority interprets the U.C.C., Brown had no stake in whether Ochs’ upheld his end of the bargain because it had Rafter Seven sign the Delivery and Acceptance clause before Rafter Seven had an opportunity to inspect. If this is the case, the U.C.C. utterly fails the lessee by allowing the lessor to shift risk to the lessee at no cost to itself. Brown only accepted the usual risk that Rafter Seven will default, and Ochs merely had its bargained-for obligation to supply the goods, but Rafter Seven was saddled with both its bargained-for obligation to make lease payments and the risk that Ochs would not perform. In essence, the lender-lessor has created a high-risk financial product, and should assume a heightened duty commensurate with the risk it has created. Cf. Am. L. Prod. Liab.3d § 1:9.

. None of this should have come as any surprise to Brown. As early as July 10, 2001, Erol Klassen, Rafter Seven’s manager, wrote Brown to tell him that Rafter Seven Ranch
has not seen the $80,000.00 you advanced toward the purchase of sprinklers, or four operating sprinklers as promised by Mr. Ochs. As of this date we have delayed planting some crops as long as possible. The growing crops are without water, which means they are certain to whither and die under this heat.... As it is now, we are high and dry. Please give me your thoughts as to what, if anything, I should do.

. The majority also suggests that the form disclaimer of warranty on the back of the lease agreements is a final nail in Rafter Seven’s coffin, reasoning that Brown was not liable for defects in the sprinklers, having disclaimed any warranty. However, it is difficult to see how a warranty, or lack thereof, informs the issue in this case. There is no dispute that Ochs delivered nonconforming equipment which Rafter Seven had the right to reject within a reasonable time; the equipment delivered did not match the specific characteristics and serial numbers identified in the leases. At best, Brown disclaimed liability for product defects, not defective performance under the leases. It is the latter that is at issue here.