No. 54,337

Bill Stair, *Appellant,* v. Rex Gaylord, d/b/a Gaylord Enterprises; Richard Diggs, d/b/a General Irrigation Company; and The Goodyear Tire and Rubber Company; *Appellees.*

(659 P.2d 178)

Opinion filed February 19, 1983.

*Tom Crossan,* of Independence, argued the cause and was on the brief for the appellant.

*Thomas A. DeVore,* of Hall, Levy, Lively, Viets & DeVore, of Coffeyville, argued the cause and was on the brief for the appellee The Goodyear Tire & Rubber Company.

*Robert K. Scovel,* of Scovel, Emert, Heasty & Oakleaf, of Independence, argued the cause and was on the brief for the appellee Richard Diggs, d/b/a General Irrigation Co.

The opinion of the court was delivered by

HERD, J.: This is a damage suit for breach of express and implied warranties, strict liability in tort, violation of the Kansas Consumer Protection Act (KCPA) and breach of contract. The trial court directed a verdict for the defendants. This appeal followed.

Since we are reviewing a directed verdict we will examine the facts giving rise to this controversy in the light most favorable to the plaintiff. Bill Stair is a commercial strawberry grower. He is able to under-price his competition by permitting his customers to pick their own strawberries. He has a five-acre patch near Independence and a seventeen-acre patch north of Bartlesville, Oklahoma. We are concerned here with the Oklahoma acreage.

Strawberries grown in the area of Stair's fields are dependent upon irrigation for successful production. The Caney River, which flows close to the Oklahoma acreage, is a plentiful source of water for irrigation. In June 1976, Bill Stair purchased an irrigation system from Gaylord Enterprises, La Cygne, Kansas, to take advantage of the available water supply. The system is composed of a travel gun connected to five hundred feet of three-inch hose. The water is pumped from the river into the hose and forced out through the gun which moves slowly across the field. The total cost of the irrigation system was $3532.37. The hose cost $2175.

Rex Gaylord, the proprietor of Gaylord Enterprises, was a dealer for the General Irrigation Company, Carthage, Missouri, which was in the business of buying components and assembling irrigation systems. The hose, which was a component part of the irrigation system, was in turn manufactured by Goodyear Tire & Rubber Company.

Mr. Stair used the irrigation system without incident during the 1977 strawberry season. On September 4, 1978, however, a pencil-sized hole developed in the hose. This caused a loss of water pressure resulting in a shutdown of the system.

At the time the hose burst, Rex Gaylord was no longer a dealer for General Irrigation, causing Stair to go directly to General Irrigation through the person in charge of product complaints, Mr. Diggs. Since Stair had not completed his irrigating, Diggs gave Stair several options which would allow continued use of the hose. Stair chose to sever a small portion of the hose and use it as a sleeve over the damaged area.

On September 7, 1978, Mr. Diggs notified Robert Carlton, a representative of Goodyear in Kansas City, of Mr. Stair's problems with his hose. On September 13, Mr. Carlton responded to Diggs, stating: "Suggest waiting until hose fails completely, or until season over, then we can request RGA [Return Goods Authorization] and return to Akron." On September 15, Mr. Diggs sent the following letter to Mr. Stair:

"I have received word from Goodyear Tire & Rubber Co. and they have indicated they will request that the hose be returned to Akron for inspection as soon as you have completed the season.

"Please let me know when you are through or if the hose fails completely."

Stair testified he called for an RGA number in November and received no reply. This is denied by appellees. However, it is undisputed on February 15, 1979, Diggs sent a letter to Mr. Stair advising: "Goodyear would like to fulfill any obligation they might have with this hose but we need to know if you are complete with use for now and present status of problem." On February 20, Mr. Stair called Mr. Diggs and requested an RGA. Mr. Diggs replied he would have to call Goodyear and get the RGA. On March 5, 1979, Mr. Diggs sent the RGA number to Mr. Stair.

Stair received his RGA number March 8, 1979. That day he

called Mr. Diggs to inquire regarding how long it would take to get the hose back from Goodyear. Before sending it he wanted to make sure he would have it or a replacement hose by April 15, 1979, because after that date his strawberries would be needing irrigation. Mr. Diggs got in touch with Goodyear, then called Stair back and assured him there would be no problem. (Mr. Diggs disputes this.) Stair shipped the hose to Goodyear the same day.

Goodyear received the hose on March 14. On April 17, 1979, Goodyear wrote to Mr. Diggs advising him that an eighty per cent credit or $1207.12 would be issued on the hose. General Irrigation then wrote Stair to inform him of Goodyear's decision. General Irrigation offered Stair $1218 in credit to be used toward the purchase of a replacement hose which in 1979 cost $2725. At the time neither Goodyear nor General Irrigation had any five-hundred-foot lengths of three-inch hose in stock. However, the letter informed Stair another manufacturer did have a five-hundred-foot length of hose.

Goodyear was not without a hose for long. After a conversation with Mr. Carlton, Mr. Diggs informed Stair Goodyear would ship a replacement hose as soon as Stair paid General Irrigation $337.88. Stair accepted the proposal. General Irrigation received his check on April 26 and ordered the hose from Goodyear the same day. It appeared the parties had settled their differences.

Goodyear shipped the replacement hose by common carrier on May 8, 1979. It was not delivered until June 14. Stair refused to accept delivery due to lateness. In the meantime, to make sure he had water to save his strawberry plants Stair had ordered a new hose from another company during the first part of June. He received that hose June 13, 1979. Mr. Stair used the new hose the rest of the season. The 1979 crop was severely damaged.

Stair filed this lawsuit against Rex Gaylord, Mr. Diggs, General Irrigation and The Goodyear Tire & Rubber Company, alleging strict liability in tort, wilful misrepresentation, breach of express warranty, breach of implied warranty of fitness and merchantability, breach of contract and violation of the KCPA, K.S.A. 50-623 *et seq.* He also alleged actual and punitive damages each in excess of $10,000.00.

The case was tried in March of 1982. Following the opening statements the court dismissed Gaylord as a party. At the con-

clusion of the evidence the court directed verdicts in favor of appellees Diggs, General Irrigation and Goodyear. Stair appealed the directed verdicts for General Irrigation and Goodyear.

Appellant first contends the trial court erred in allowing each of the three original defendants three peremptory challenges. K.S.A. 60-247(c) governs the allowance of peremptory challenges when there are multiple defendants:

"In civil cases, each party shall be entitled to three (3) peremptory challenges, except as provided in subsection (h) of section 60-248, as amended, pertaining to alternate jurors. Multiple defendants or multiple plaintiffs shall be considered as a single party for purpose of making challenges except that if the judge finds there is a good faith controversy existing between multiple plaintiffs or multiple defendants, the court in its discretion and in the interest of justice, may allow any of the parties, single or multiple, additional peremptory challenges and permit them to be exercised separately or jointly."

Appellant argues there was no good faith controversy existing between the multiple defendants in this case. An examination of the record shows each defendant filed cross-claims against the other two, claiming Mr. Stair's problems were the fault of the other defendants. Because of this and because the statute places the awarding of additional peremptory challenges within the discretion of the trial court, we find no error. See *Massoni v. State Highway Commission,* 214 Kan. 844, 852-53, 522 P.2d 973 (1974).

Since all the remaining issues involve the propriety of the directed verdicts entered by the trial court let us examine this court's scope of review. We have held in reviewing a directed verdict this court will resolve all facts and inferences in favor of the party against whom the ruling is sought. If the evidence is such that reasonable minds could reach different conclusions thereon, the motion should be denied. *Lemley v. Penner,* 230 Kan. 25, 27, 630 P.2d 1086 (1981).

Initially there is the question regarding the applicability of the Kansas Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.,* and, more specifically, Article 2 of that code, K.S.A. 84-2-201 *et seq.* The scope of Article 2 is set out in K.S.A. 84-2-102, which reads as follows:

"Unless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a

security transaction nor does this article impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers."

According to K.S.A. 84-2-106(1): "A 'sale' consists in the passing of title from the seller to the buyer for a price." Obviously, a sale is a transaction. "Goods is defined in K.S.A. 84-2-105:

"(1) 'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action. 'Goods' also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (section 84-2-107).

"(2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are 'future' goods. A purported present sale of future goods or of any interest therein operates as a contract to sell."

The transaction involving the irrigation system was a "sale" and the hose purchased as a part of that system clearly falls within the definition of "goods." We conclude the UCC is applicable.

It is clear Goodyear made an express warranty regarding the five-hundred-foot hose. K.S.A. 84-2-313(1)(a) states:

"(1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

In the Goodyear Tire & Rubber Company Irrigation Hose Guarantee, Goodyear assured the buyer the hose would be "free from defects in material and workmanship."

The issue before the trial court was whether Goodyear had breached this express warranty. In order to take the case from the jury the trial court had to find there was no evidence Goodyear breached its express warranty. In other words, the appellant had to present some evidence Goodyear's warranty became a part of the basis of the bargain and the product did not live up to the assurances in the warranty. Goodyear's Irrigation Hose Warranty lasted at least in part for five years. The fact the hose developed a hole after approximately one and one-half years is evidence the product was defective. Goodyear's willingness to offer an eighty percent credit and late to replace the hose is further evidence it considered the product defective. Even though a settlement was reached between the parties pertaining to the damaged hose, it

was never completed due to a delay in delivery of the hose. Thus the question of whether a settlement was reached and, if not, the question of Goodyear's breach of express warranty remains unresolved. Both questions should have been submitted to the jury.

General Irrigation made a similar warranty regarding its products but this warranty was limited by the following statement: "Components manufactured by others than General Irrigation Company have no warranty except that given by the original manufacturer."

Since General Irrigation made no express warranty regarding the hose the question arises whether it still could have been liable under the implied warranty of merchantability theory. K.S.A. 84-2-314(1) states:

"[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

General Irrigation could clearly be considered a merchant because it deals in goods of the kind involved here. K.S.A. 84-2-104. Further, the fact General Irrigation did not sell the hose directly to Stair is of no consequence. K.S.A. 1982 Supp. 50-639(b), a part of the KCPA which will be discussed in more detail later, states: "[N]o action for breach of warranty with respect to property subject to a consumer transaction shall fail because of a lack of privity between the claimant and the party against whom the claim is made." Similarly, the Kansas comment to K.S.A. 84-2-314 states in part: "The concept of fitness for ordinary purposes is part of the warranty of merchantability and extends protection to the ultimate consumer as well as to a merchant buying for resale."

The applicability of these rules will be questionable in subsequent breach of warranty cases. The Products Liability Act, K.S.A. 1982 Supp. 60-3301 *et seq.,* now excuses a seller from liability for a defective product manufactured elsewhere if he had no knowledge of the defect and could not have discovered the defect while exercising reasonable care. K.S.A. 1982 Supp. 60-3306. This statute however, was not enacted until the 1981 legislative session, long after Mr. Stair had experienced problems with his irrigation system. Generally a new statute will operate only prospectively unless (1) its language clearly indicates the legislature intended it to operate retrospectively, or (2)

the statutory change is merely procedural or remedial in nature and does not affect the substantive rights of the parties. *Davis v. Hughes,* 229 Kan. 91, 101, 622 P.2d 641 (1981); *Nitchals v. Williams,* 225 Kan. 285, Syl. ¶¶ 1, 2, 590 P.2d 582 (1979). Since neither of these exceptions are pertinent here K.S.A. 1981 Supp. 60-3306 does not apply to the case at bar.

To be merchantable goods must be at least "fit for the ordinary purposes, for which such goods are used." K.S.A. 84-2-314(2)(*c*). In this sense a buyer can show a product is unmerchantable if it is defective when it leaves the manufacturer's control. *Butterfield v. Pepsi-Cola Bottling Co.,* 210 Kan. 123, 126, 499 P.2d 539 (1972). Again, since there was evidence the hose was defective there was evidence from which the jury could have found the irrigation system was defective. As such the question of whether General Irrigation breached the implied warranty of merchantability should also have been allowed to go to the jury.

Once a warranty is breached by the seller the buyer is entitled to an appropriate remedy. There was evidence Mr. Stair and the appellees had agreed the remedy would be a new hose shipped to Mr. Stair for $337.88. There was also evidence, however, this agreement broke down because of delay in delivery. The question of whether this agreement had in fact dissolved and whether Stair properly refused delivery of the hose was essentially a fact question for the jury.

If Mr. Stair did properly refuse delivery of the hose he was then entitled to turn to the remedies provided by the UCC. K.S.A. 84-2-714 covers the buyer's damages with regard to goods which have already been accepted:

"(1) Where the buyer has accepted goods and given notification (subsection (3) of section 84-2-607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

K.S.A. 84-2-715 deals with incidental and consequential damages:

"(1) Incidental damages resulting from the seller's breach include expenses

reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

"(2) Consequential damages resulting from the seller's breach include

"(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

"(b) injury to person or property proximately resulting from any breach of warranty."

See also *Panhandle Agri-Service, Inc. v. Becker,* 231 Kan. 291, 298, 644 P.2d 413 (1982).

In all cases involving a buyer's damages for breach regarding accepted goods, the burden of proof is on the buyer. K.S.A. 84-2-607(4).

The controversy here surrounds Stair's claimed damages for partial loss of his 1979 strawberry crop, allegedly the result of the breach of warranty. At trial Mr. Stair showed evidence of the difference in his strawberry crop profits between 1979 and other years. The appellees argued the figures were speculative and didn't include some of the operating expenses, such as fuel costs and taxes. The trial court agreed and cited this as the major reason for the directed verdicts.

The basic objective of damages under the UCC is "that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." K.S.A. 84-1-106(1). One commentator has stated: "Without incidental and consequential damages this goal would be unreachable in many cases . . . . The availability of consequential damages is vital. It may mean the difference between recovering one dollar, the price of a defective part, and one million dollars, the damages caused as a result of the defective part, in personal injury, lost profits, and more." Rasor, Kansas Law of Sales Under the UCC § 10-11, pp. 10-36, 10-37. See also *La Villa Fair v. Lewis Carpet Mills, Inc.,* 219 Kan. 395, 406, 548 P.2d 825 (1976).

Under the UCC consequential damages need not be proven with any particular degree of certainty. Indeed, one purpose of subsection (1) of K.S.A. 84-1-106 "is to reject any doctrine that damages must be calculable with mathematical accuracy. Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more." Official UCC Comment, § 1-106. In addition,

K.S.A. 84-2-715(2)(*a*) requires a showing the damages were reasonably foreseeable and that the buyer attempted to mitigate damages. See Rasor, p. 10-38; *International Petroleum Services, Inc. v. S & N Well Service, Inc.*, 230 Kan. 452, 463, 639 P.2d 29 (1982).

Given the broad scope of the UCC provisions on damages, we are convinced the damages issue should have been submitted to the jury. Appellant's evidence showed he grossed $22,210.60 with a net profit of $17,021.85 from seven acres of strawberries at the Bartlesville field in 1978. It further revealed he grossed only $10,235.25 with expenses of $6160.43 from seventeen acres of strawberries at Bartlesville in 1979. Finally, his evidence was that the same seventeen acres of strawberries grossed $30,179.20 with a net profit of $22,880.76 in 1980. The expense items of fuel and taxes were omitted from the accountings for all three years, making comparison valid. The incomplete evidence regarding expenses, however, does not render the accounting statement false or incorrect. The evidence shows the dramatic reduction in production and sales for 1979. The appellees vigorously cross-examined the Stairs thereby informing the jury the expense items were incomplete. The appellant was not required to provide an exact dollar amount of damages. The evidence presented a valid question of fact from which the jury could have rendered a verdict.

However, even if the evidence of damages is adequate for submission to the jury on that issue, there remains the question of causation. If appellant's lost profits are not attributable to the defective hose and the delivery of its replacement, there was no issue to submit to the jury. See Official UCC Comment 13, K.S.A. 84-2-314.

We have held the question of causation is essentially a jury question. *Sieben v. Sieben*, 231 Kan. 372, 374, 646 P.2d 1036 (1982). Therefore, if there was any evidence introduced tending to show the appellees' actions caused Stair's damages, the issue should have gone to the jury. Here, appellant offered evidence his receipts from strawberry sales were lower in 1979 than in 1978 and 1980 when he had adequate irrigation. The jury could reasonably have found this was due to the defective hose. Stair also offered evidence appellees were unreasonably slow in delivering a replacement hose for the defective one in violation of

their agreement. Thus, there was also evidence the appellees' acts caused Stair's damages. Hence, the jury should have been permitted to decide the factual questions.

The next issue pertains to the application of the KCPA, K.S.A. 50-623 *et seq.* The trial court found there was no violation of the Act and directed a verdict in favor of the appellees. Appellant argues this was error.

The KCPA was enacted by the Kansas legislature in 1973 with the objectives, among other things, "to protect consumers from suppliers who commit deceptive and unconscionable practices," and "to protect consumers from unbargained for warranty disclaimers." K.S.A. 50-623(b) and (c). In order to promote these policies the KCPA is to be construed liberally. *Willman v. Ewen,* 230 Kan. 262, 267, 634 P.2d 1061 (1981).

The most important provisions of the Act are K.S.A. 50-626(a) which states: "No supplier shall engage in any deceptive act or practice in connection with a consumer transaction," and K.S.A. 50-627(a) which states: "No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." K.S.A. 50-624(b) defines "consumer" as "an individual who seeks or acquires property or services for personal, family, household, business or agricultural purposes." "Agricultural purposes" refers to "a purpose related to the production, harvest, exhibition, marketing, transportation, processing or manufacture of agricultural products by a natural person who cultivates, plants, propagates or nurtures the agricultural products." K.S.A. 50-624(a). A "supplier" is "a manufacturer, distributor, dealer, seller, lessor, assignor or other person who, in the ordinary course of business, solicits, engages in, or enforces consumer transactions, whether or not he or she deals directly with the consumer." K.S.A. 50-624(i). Finally, a "consumer transaction" means "a sale, lease, assignment or other disposition for value of property or services within this state  .  .  .  to a consumer or a solicitation by a supplier with respect to any of these dispositions." K.S.A. 50-624(c). Plainly, the KCPA applies. Mr. Stair was a consumer, General Irrigation and Goodyear were suppliers and the sale of the irrigation hose was a consumer transaction.

The real question here is whether there is any evidence by which the jury could have found either of the appellees were guilty of a deceptive or unconscionable practice. Deceptive acts

include "the intentional failure to state a material fact or the intentional concealment, suppression or omission of a material fact . . . ." K.S.A. 50-626(*b*)(3). Here, if the alleged assurances that the hose would be returned by a certain date were made knowing there was no way this could be done the appellees might be liable. There is no evidence, however, that such was the case. If the assurances were made they were made sincerely and the appellees simply were not able to live up to them.

Neither is there any evidence the appellees committed any unconscionable acts. Unconscionability is a question for the court, K.S.A. 50-627(*b*), and there is no evidence of such practices.

The final question also involves the KCPA. K.S.A. 1982 Supp. 50-639(*a*) states: "[N]o supplier shall: (1) Exclude, modify or otherwise attempt to limit the implied warranties of merchantability and fitness for a particular purpose." K.S.A. 1982 Supp. 50-634 allows a private person to bring an action to establish a violation of the KCPA and K.S.A. 1982 Supp. 50-636(*a*) allows the court to impose a civil penalty of up to $2000 on the violator. K.S.A. 1982 Supp. 50-639(*e*) states:

"A disclaimer or limitation in violation of this section is void. If a consumer prevails in an action based upon breach of warranty, and the supplier has violated this section, the court may, in addition to any actual damages recovered, award reasonable attorney's fees and a civil penalty under K.S.A. 50-636, and amendments thereto, or both to be paid by the supplier who caused the improper disclaimer to be written."

The warranties given by both General Irrigation and Goodyear contain statements to the effect that the express warranties made were in lieu of all other warranties expressed or implied. Obviously both appellees were attempting to limit the implied warranties imposed by K.S.A. 84-2-314 and -315 and as such were in violation of the KCPA. The appellees rely on K.S.A. 1982 Supp. 50-639(*f*) which states: "The making of a limited express warranty is not in itself a violation of this section." This section, however, is not applicable to the present controversy. It merely recognizes that since an express warranty is not required to be made at all, a limited express warranty is proper. It does not allow a supplier to use a limited express warranty to exclude implied warranties. See Rasor, pp. 9-24, 9-25; Clark, "Lemon Aid for Kansas Consumers," 46 J.B.A.K. 143, 147 (1977). Thus the

trial court erred in holding as a matter of law there was no violation of the KCPA. Pursuant to K.S.A. 50-639(e), the trial judge should have submitted the case to the jury to see if Mr. Stair prevailed on his breach of warranty claim. If he did prevail the trial court could then have imposed civil penalties.

The judgment of the trial court is reversed and the case remanded for a new trial.

McFARLAND, J., dissenting.