No. 56,877

Meier's Trucking Company, *Appellant/Cross-Appellee*, v. United Construction Company, Inc., *Appellee/Cross-Appellant*.

(704 P.2d 2)

Opinion filed July 26, 1985.

*Gary D. McCallister*, of Davis, Unrein, Hummer & McCallister, of Topeka, argued the cause, and *James G. Keller* and *Michael J. Unrein*, of the same firm, were with him on the briefs for appellant.

*Anne L. Baker*, of Eidson, Lewis, Porter & Haynes, of Topeka, argued the cause, and *William G. Haynes*, of the same firm, was with her on the brief for appellee/cross-appellant.

The opinion of the court was delivered by

McFarland, J.: This is a dispute between a subcontractor (Meier's Trucking Company) and the general contractor (United Construction Company, Inc.) involving a highway construction project. Meier's three-count petition claims: (1) it is owed money for work performed; (2) it is owed damages arising from United's breach of its contract; and (3) United is guilty of civil conspiracy. The case was called for jury trial. At the conclusion of plaintiff Meier's case in chief, the trial court: (a) entered judgment in favor of Meier's on count No. 1 in the amount of $24,029.43 (this claim was not disputed by United); (b) directed a verdict in favor of United on count No. 2, finding no breach of contract had occurred; and (c) dismissed count No. 3. Meier's appeals, contending the trial court erred in not submitting claims 2 and 3 to the jury. United's cross-appeal involves the rationale utilized by the trial court in dismissing count No. 3. The trial court held that the failure of Meier's to establish a breach of contract under count No. 2 was fatal to the count No. 3 conspiracy claim. The issue on the cross-appeal is submitted for consideration only in the event the directed verdict on count No. 2 is reversed. There is no issue before us relative to the $24,029.43 judgment entered on count No. 1.

The key issue in the appeal is whether or not the trial court erred in ruling, as a matter of law, that United did not breach the parties' contract. Meier's contends that a certain change order, greatly reducing the amount of work to be performed by Meier's, constituted a breach of contract. In order to determine this issue the complex factual situation from which this litigation arose must be set forth in considerable detail.

As anyone familiar with the area knows, many substantial alterations in the topography of Johnson County have occurred in recent years and continue to occur as a result of highway construction. Looking forward to the future construction of the interchange of I-435 and I-35 (said interchange known as the Maltese Cross), certain contracts were let in 1979 by the Kansas Department of Transportation (KDOT) for the area. United was awarded a contract for what was known as the I-435 project. This was characterized as a "heavy grading project" for the construction of the roadway and building of bridges. Final surfacing was not included. The work was to be performed in an area bounded roughly by 87th Street, Lackman Road, 103rd Street, and Renner Road.

At about the same time, KDOT awarded two other heavy grading projects of similar nature to Clarkson Construction Company. These projects were commonly referred to as the K-12 project, with the work to be performed in an area bounded roughly by 95th Street, Renner Road, 111th Street, and Lone Elm Road. The Clarkson and United work areas abutted each other and each involved hauling a portion of the excavated materials to common stockpiles situated near the future site of the Maltese Cross intersection for use in construction thereof. Otherwise the K-12 and I-435 projects were considered to be independent of each other.

The United contract called for the excavation of an estimated 810,524 cubic yards (c.y.) of common, or earth, and 1,699,983 c.y. of rock. The contract price was $6,477,108.06. As previously stated, a portion of this material was to be hauled to the Maltese Cross stockpiles. United entered into a subcontract with Meier's wherein Meier's was to haul an estimated 245,432 c.y. of common excavation at a unit price of 1.39/c.y. and 316,668 c.y. of rock excavation at a unit price of 1.64/c.y. to the stockpiles for a total contract price of $860,486.00. Excavation was commenced by

United and Meier's began hauling material to the stockpiles under the subcontract. United became concerned that there was a substantial shortfall between the estimated amount of material to be excavated and the actual quantities. United sought to renegotiate the per c.y. price it was to receive from KDOT based upon the shortfall. KDOT checked into the matter and denied there was a shortfall. On April 26, 1980, United advised Eugene Meier (a partner in the firm) to discontinue hauling as a result of the shortfall dispute it had with KDOT. On May 2, 1980, Eugene Meier conferred with officials of United in the latter's Kansas City office as to when hauling would resume. Meier stated he needed an idea of the time frame involved in the interruption as he was looking at some other construction projects. United offered to let him out of the subcontract. Meier stated he neither accepted nor rejected the offer. United officials believed Meier had accepted the offer and sent him a letter confirming the same on May 5, 1980. (For purposes of determining the propriety of the directed verdict, we accept Meier's version). At the time work under the subcontract ceased, Meier had hauled 72,264 c.y. of material.

It is necessary at this point to turn our attention to the Clarkson K-12 project. Santa Fe railroad tracks bisect the Clarkson work area from north to south. The Clarkson project was bid on the basis that the contractor would be able to move, by vehicles, large quantities of excavation across the tracks. Santa Fe refused to agree to this. Clarkson was faced with greatly increased costs as it would have to build an expensive conveyor system over the tracks. Clarkson believed this increased cost factor should be borne by KDOT, who did not agree. To fortify its position, Clarkson contacted other bidders on the K-12 project to see if they, too, had understood vehicle passage over the tracks would be afforded and had bid with that understanding. United had been one of the unsuccessful bidders on the K-12 project and was thus contacted. The individual contacted was James Supica, United's president. The telephone call occurred sometime in the late spring or early summer of 1980. Clarkson was unable to negotiate a settlement of its problem with KDOT and filed a multi-million dollar damage suit against KDOT.

James Supica testified he became concerned over the Clarkson lawsuit and the possible chilling effect it might have on future

highway construction projects in Johnson County. The actions of Mr. Supica at this point are the basis of Meier's claim of breach of contract. In reviewing the propriety of a directed verdict, an appellate court is required to resolve all facts and inferences in favor of the party against whom the judgment was entered. (*Stair v. Gaylord*, 232 Kan. 765, 659 P.2d 178 [1983]). We will, therefore, include herein the version of subsequent events which is contained in Meier's brief before this court as follows:

"After Clarkson filed a lawsuit against KDOT regarding the K-12 project, James Supica of United inquired of Dean Testa of KDOT whether the State had ever considered looking at the K-12 project of Clarkson and the I-435 project of United as one area rather than two separate contracts. No one else ever made this same suggestion to Dean Testa. After James Supica made this suggestion, Dean Testa reviewed the plans for the two separate projects to see if some unified solution could be made which would eliminate the Clarkson lawsuit. In July of 1980 a meeting was held with James Supica, William Clarkson and representatives of KDOT in attendance. The intent of the parties at this meeting was to reach an agreement to modify both the Clarkson K-12 project and the United I-435 project in an acceptable manner to both parties and to KDOT and remove the Clarkson litigation. Dean Testa had visited with both United and Clarkson prior to the meeting regarding changes in stockpiles. James Supica of United volunteered to come to the meeting when asked by KDOT. Supica on behalf of United submitted a change of unit price on excavation from $2.58 a yard to $1.83 a yard which was accepted by KDOT. Supica on behalf of United Construction voluntarily agreed and acquiesced in the understanding reached at the July 1980 meeting. Supica also voluntarily signed all the change orders that resulted from the July 1980 meeting. A supplemental agreement was also prepared by KDOT and signed by James Supica on behalf of United. At the time that the changes in the projects were made, James Supica of United was aware that the Meier's subcontract would be affected. The State Engineer was uncertain what would have been done to make the changes in the projects if United had not agreed to the changes. He believed there may have been some difficulty since the changes involved two different contracts.

"After the changes were made United had the opportunity to use its own equipment to dispose of the material which was previously to have been hauled by Meier's Trucking, and pursuant to change order 13-F, was now to be wasted on the project. United would be able to haul the same material cheaper because it could use larger on-site equipment rather than dump trucks such as used by Meier's. In addition, the material would be hauled to a closer off-site waste area.

"Under change order 13-F the remainder of the material which was to be hauled to the stockpile by Meier's Trucking was 'underrun' thereby eliminating the task for which Meier's Trucking had been employed. This amount of material (489,597 cubic yards) was added to the contract as 'excavation special' to be hauled at a reduced unit price of $1.83 [per] cubic yard and then wasted at sites provided by United. Meier's Trucking was informed by United that it had hauled 72,264 yards at that time by United's count. The State determined that 39,420

cubic yards of common excavation and 33,083 cubic yards of rock had been hauled to the stockpiles to that point.

"Under Change Order 13-F the same excavation material that was to be hauled by Meier's Trucking to state-owned stockpiles was to be 'wasted' at sites provided by United. A stockpile is a place where rock or dirt is collected for later use. The stockpiles to which Meier's Trucking was hauling materials were to be used in the future construction of the Maltese Cross Interchange. 'Waste' is simply material that is being excavated from a project and not incorporated into the project. Common excavation wasted off a project in Johnson County, Kansas, is a valuable commodity."

It should be noted the change orders issued on the Clarkson job in January, 1981, resulted in a reduction of the Clarkson contract price of approximately $750,000. United change order (No. 13-F), also issued in January, 1981, reduced the United contract price by $367,197,75. Thus, the change orders resulted in contractual savings to the owners (State of Kansas) of over $1,000,000. Additionally, the Clarkson litigation was eliminated.

The trial court held United had not breached its contract with Meier's by virtue of its activities culminating in the issuance of change order No. 13-F. We agree.

The subcontract between Meier's and United provides in pertinent part:

"**Section 1.** *The Subcontractor agrees to furnish all necessary materials and/or to furnish all labor, tools, equipment and supplies necessary to perform, and to perform all work set forth in 'Section 2' hereof in the construction of [the I-435 project] for Kansas Department of Transportation, hereinafter called the Owner, at Topeka, Kansas, in accordance with the terms and provisions of the Contract between the Owner and the Contractor,* dated Dec. 12, 1979, including all the General and Special Conditions, Drawings and Specifications and other Documents forming or by reference made a part of the Contract between the Contractor and the Owner, all of which shall be considered part of this Subcontract by reference thereto, and the Subcontractor agrees to be bound to the Contractor and the Owner by the terms and provisions thereof.

"**Section 2.** It is agreed that the materials to be furnished and/or work to be done by the Subcontractor are as follows:

| Description | Estimated Quantity | Units | Unit Price | Amount |
|---|---|---|---|---|
| Truck Haul Common Excavation to Stockpile No. 1 (Soil & Shale) | 245,432 | C.Y. | 1.39 | $341,150.48 |
| Truck Haul Rock Excavation to Stockpile No. 2 (Limestone) | 316,668 | C.Y. | 1.64 | $519,335.52 |
| | | | | $860,486.00 |

"**Section 3.** The Contractor agrees to pay the Subcontractor for the materials to

be furnished and work to be performed hereinunder, and performance of this contract *as otherwise* provided for herein, the sum of eight hundred sixty thousand four hundred eighty six and no/100 dollars ($860,486.00), *subject to additions and deductions for changes as may be agreed upon*, or determined, as provided for herein . . . .

"**Section 4.** *The Contractor reserves the right to make changes in materials to be furnished or work to be performed under this Subcontract, or additions thereto or omissions therefrom, upon written order to the Subcontractor.*

* * *

"**Section 8.** The Subcontractor further specifically obligates himself to the Contractor in the following respects, to wit: . . . (f) *The Subcontractor assumes towards the Contractor all the obligations and responsibilities that the Contractor assumes toward the Owner*, as set forth in the Contract, General and Special Conditions, Drawings, Specifications and other Documents hereinabove referred to, insofar as applicable, generally or specifically, to the materials to be furnished and the work to be performed under this Subcontract; (g) In the event of any inconsistency or conflict between the provisions of this subcontract and the contract between the owner and contractor, the contract between owner and contractor shall prevail." (Emphasis added).

The general contract provides in pertinent part:

"**104.03 ALTERATIONS OF PLANS OR CHARACTER OF WORK**—The Commission [State Highway Commission, now Kansas Department of Transportation] reserves the right to make, at any time during the progress of the work, such increases or decreases in quantities and such alterations in the details of construction, including alterations in the grade or alignment of the road or structure or both, as may be found to be necessary or desirable. Such increases or decreases and alterations shall not invalidate the Contract nor release the Surety, and the Contractor agrees to accept the work as altered, the same as if it had been a part of the original Contract."

Change order No. 13-F, which eliminated much of the hauling that would have been performed by subcontractor Meier's, was prepared by KDOT and resulted in substantial contractual savings to it. The Clarkson change orders resulted in even greater contractual savings for KDOT and the elimination of a substantial lawsuit against it.

Meier's does not really challenge KDOT's right to issue change orders or that terms and alterations in the general contract are binding upon it as a subcontractor. Rather, Meier's contends that United's change order to it (issued as a result of KDOT's change order No. 13-F) is not a change order but, in reality, constitutes a termination of the subcontract and should be subject to contractual provisions relative to termination. We do not agree. Omission of work is one of the categories of

changes provided for in Section 4 of the subcontract. It should be emphasized that the hauling subcontracted to Meier's was for material to be hauled in dump trucks to the two designated Maltese Cross stockpiles. The No. 13-F change order eliminated hauling to these sites. "Wasting" the material did not involve hauling the excavated material by dump truck. We do not have a situation where the general contractor took over the work previously subcontracted to another.

In 1981, when additional material was hauled to the Maltese Cross stockpiles from this project, Meier's did the hauling. Certainly the work of the subcontractor was reduced by the change order. The situation may be likened to the owner eliminating a brick facade on a construction project to save money. The change order may eliminate much of the masonry subcontract but if the parties have agreed to be bound by changes in design the subcontractor has no legal complaint absent circumstances not present herein. Meier's entered into the subcontract herein which was to haul estimated quantities of material to two designated stockpiles, subject to addition and omission thereto, and subject to conditions imposed upon the general contractor in its contract with the Highway Commission (KDOT). The quantity of work was modified by the change order.

Next Meier's argues that the fact that it was United who first mentioned to KDOT the idea of combining the abutting Clarkson and United projects as a means of saving KDOT contractual costs on both projects and eliminating the Clarkson lawsuit is evidence of bad faith on the part of United—especially when coupled with the fact that the material "wasted" to United as a result of the subsequent change order may be of value to United. We do not agree. To penalize a general contractor for suggesting to the owner a possible means of saving the owner money by changing construction plans is, generally speaking, poor public policy and is all the more so when tax dollars are paying the project's cost. We agree with the trial court that the evidence herein, taken in the light most favorable to Meier's, is insufficient, as a matter of law, to constitute bad faith on the part of United so as to support a claim of breach of contract. We conclude the trial court did not err in finding that, as a matter of law, United did not breach its contract with Meier's and, accordingly, in directing a verdict in favor of United on count No. 2.

Meier's claim of error relative to the trial court's dismissal of count No. 3 (civil conspiracy) is dependent upon a successful challenge to the trial court's determination that no breach of contract occurred. Our affirmance of the breach of contract issue disposes of the issues relative to count No. 3 raised on the appeal and cross-appeal.

The judgment is affirmed.

HOLMES, J. dissenting: I respectfully dissent. The critical issue in this case is whether United, having reserved under the subcontract a discretionary right to make additions to or omissions from the hauling to be performed by Meier's, was entitled to terminate the subcontract after instigating the KDOT change order under which United itself later hauled and acquired all rights to the same excavated material.

"A majority of American jurisdictions, the *Restatement (Second) of Contracts*, and the Uniform Commercial Code (U.C.C.) now recognize the duty to perform a contract in good faith as a general principle of contract law." Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv. L. Rev. 369 (1980).

We have recognized and applied the principles of good faith in a variety of situations. *See Iola State Bank v. Bolan*, 235 Kan. 175, 183, 679 P.2d 720 (1984); *Baker v. Ratzlaff*, 1 Kan. App. 2d 285, 289, 564 P.2d 153 (1977). Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. K.S.A. 84-1-203; Restatement (Second) of Contracts § 205 (1979); 17 Am. Jur. 2d, Contracts § 256. There is an implied undertaking on the part of each party that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. 17 Am. Jur. 2d, Contracts § 256. "Good faith" means honesty in fact in the conduct or transaction concerned (K.S.A. 84-1-201[19]), fair dealing and a duty of cooperation on the part of both parties (17 Am. Jur. 2d, Contracts § 256). The majority's holding United's actions were consistent with the implied obligation of good faith eviscerates that obligation.

Good faith, as it applies to contractual obligations, has been defined and described in various ways.

"The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract

emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." Restatement (Second) of Contracts § 205, Comment a.

"Bad faith" includes "a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Black's Law Dictionary 176 (4th ed. rev. 1968).

"Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or consist of inaction, and fair dealing may require more than honesty. A complete catalogue of the types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, . . . abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Restatement (Second) of Contracts § 205, Comment d.

The majority places great emphasis on various provisions of the subcontract reserving to United the right to make additions to or omissions from the hauling to be performed by Meier's. But even where a party possesses discretionary power in the performance of a contract the law implies an obligation on that party to use honest judgment and faithful performance in exercising that discretion. *Heckard v. Park*, 164 Kan. 216, Syl. ¶ 5, 188 P.2d 926 (1948). Meier's subcontract was conditional in the sense full performance by both parties was conditioned on KDOT issuing no change orders concerning the scheduled hauling. True, where under the terms of a contract the occurrence of an event terminates an obligor's duty of immediate performance, that duty is discharged if the event occurs. Restatement (Second) of Contracts § 230(1) (1979). However, the obligor's duty is not discharged if occurrence of the event is the result of a breach by the obligor of his duty of good faith and fair dealing. Restatement (Second) of Contracts § 230(2)(a).

Where a contract is to be performed upon the *occurrence* of a future event, there is an implied agreement that the obligor will place no obstacle in the way of the occurrence of such event, and if he himself is the cause of the failure of the condition to occur he cannot rely on such failure to defeat his liability. *Cowden Mfg. Co., Inc. v. Systems Equip. Lessors*, 608 S.W.2d 58 (Ky. App. 1980). The converse of that rule applies in this case: where

performance of a contract is premised on the *nonoccurrence* of a future event (here, the issuance of a KDOT change order eliminating the hauling to be done) there is an implied agreement that the obligor (defendant) will not promote or foster the happening of such event, and if the obligor is the cause of the occurrence of that event it cannot rely on that event or condition to defeat its liability for breach of the contract by reason of nonperformance.

The obligation of good faith in the exercise of discretionary powers under a contract is thoroughly discussed by Professor Burton in the article previously cited. In part, Professor Burton says:

"The good faith performance doctrine establishes a standard for contract interpretation and a convenant that is implied in every contract. . . . [E]xpress contract terms alone are insufficient to determine a party's good faith in performance.

". . . . Good faith limits the exercise of discretion in performance conferred on one party by the contract. When a discretion-exercising party may determine aspects of the contract, such as quantity, price, or time, it controls the other's anticipated benefits. Such a party may deprive the other of these anticipated benefits for a legitimate (or good faith) reason. The same act will be a breach of the contract if undertaken for an illegitimate (or bad faith) reason. . . .

"Bad faith performance occurs precisely when discretion is used to recapture opportunities forgone upon contracting — when the discretion-exercising party refuses to pay the expected cost of performance. Good faith performance, in turn, occurs when a party's discretion is exercised for any purpose within the reasonable contemplation of the parties at the time of formation — to capture opportunites that were preserved upon entering the contract, interpreted objectively. The good faith performance doctrine therefore directs attention to the opportunities forgone by a discretion-exercising party at formation, and to that party's reasons for exercising discretion during performance.

"*B. Breach of Contract by Failing to Perform in Good Faith*

"*1. Good Faith: The Reasonable Contemplation of the Parties—*
. . . . The good faith performance doctrine may be said to permit the exercise of discretion for any purpose — including ordinary business purposes — reasonably within the contemplation of the parties. A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range — a reason beyond the risks assumed by the party claiming a breach.

"*2. Bad Faith: Recapturing Forgone Opportunities* — Bad faith performance consists of an exercise of discretion in performance to recapture opportunities forgone at formation. The dependent promisee's expectations encompass both the subject matter to be received under a contract, and the expected costs of

performance by the other party. A recapture by one party of forgone opportunities necessarily harms the other. A reasonable person accordingly would enter a contract that confers discretion on the other party only on the belief that the discretion will not be used to recapture forgone opportunities.

. . . .

"The question whether a party used its discretion in order to recapture forgone opportunities is one of subjective intent, and is a question of fact for the jury." Burton, 94 Harv. L. Rev. at 371, 372-73, 385-87, 389.

With the foregoing basic principles in mind, did the evidence in this case warrant summary judgment as a matter of law? I think not. The evidence in this case shows a pattern of repeated efforts by United to oust Meier's from the project. The "substantial shortfall" between the estimated amount of material to be excavated and the actual quantities was a discrepancy perceived only in the minds of United's officers, without any basis in fact. Four times United attempted to persuade KDOT this shortfall existed, and four times KDOT investigated the matter and found it to be untrue. In its last letter KDOT advised United that if it wished to pursue this claim it would have to produce supporting data and computations. None was produced and between KDOT and United the issue was dropped. Only after this matter had been resolved against United's contentions did United then inform Meier's Trucking the hauling was to be discontinued due to the state's "problems" and discrepancies.

Was there in fact a shortfall between the estimated and actual amounts of excavated material? Consistent with the majority's stated preference for plaintiff's recitation of the facts, further consideration of plaintiff's brief is justified:

"A comparison of the quantities of excavation to be hauled by Meier's Trucking according to the subcontract and the quantities ultimately hauled or wasted under the change order solicited by United further shows that there was no discrepancy in the amount of excavation to be hauled. No basis existed for United's representation to Meier's that such discrepancies existed, either in April of 1980 or as finally determined. Under the terms of the subcontract the original estimated quantity of hauling was a total of 562,100 cubic yards. According to the evidence introduced at trial, Meier's Trucking actually hauled 136,607 cubic yards of excavation, leaving a difference between what was originally estimated and what was actually hauled by Meier's of 425,493 cubic yards. After Meier's initially hauled 72,503 cubic yards of material, progress was halted by order of United. At this point change order 13-F was sent directing that 489,597 cubic yards which would have been hauled by Meier's Trucking under the subcontract was to be wasted on the job by United rather than being placed in the stockpile. Subsequently, change order 18-T removed an estimated quantity of 65,000 yards

from the 'waste' category under change order 13-F and added it to the contract as 'excavation special (stockpile)'. Meier's Trucking subsequently hauled 64,104 cubic yards pursuant to this change. If the amount of 64,104 cubic yards of excavation material hauled by Meier's Trucking is subtracted from the 489,597 cubic yards to be wasted under change order 13-F, the quantity actually wasted on the job, according to the state's figures, would be 425,493 cubic yards. This is the exact amount shown on the final change order as 'Excavation Special' which was to be 'wasted' by United. Obviously, no 100,000 cubic yard discrepancy existed as claimed by United in the early part of 1980."

The meeting between Eugene Meier and United officials on May 2, 1980, concluded without any agreement on the proposed termination of the subcontract. The only United official who "believed" Meier had accepted the offer of termination was United's president, James Supica. Eugene Meier's testimony that he neither accepted nor rejected the offer was corroborated by the deposition testimony of T. C. Schmidt, a United vice president who also attended the meeting. In this light Supica's subsequent "confirmation" letter is merely another instance of United's attempts to avoid its obligations under the subcontract.

The important points about Supica's involvement in the dispute between Clarkson and KDOT are these. First, as the majority recognizes, the K-12 and I-435 projects were physically and contractually independent. The evidence is clear that regardless of Supica's supposed concerns over its impact, the dispute between Clarkson and KDOT would not have affected United's contract on the I-435 project. Second, the majority is simply in error when it states, "We do not have a situation where the general contractor took over the work previously subcontracted to another." That statement is flatly contradicted by plaintiff's version of the evidence, which the majority recites and purports to accept as true. Change order 13-F, the idea for which had originated with United, eliminated the long-distance hauling for which Meier's Trucking had been employed and gave to United the new short-distance hauling of the same excavated material *as well as* ownership of the material itself. There was no change in the amount of material to be hauled, only in the manner of its disposition. United took over the identical work, on somewhat different terms, that it had previously hired Meier's to do. Based upon the evidence a jury could find that it was done for the sole purpose of eliminating the Meier's contract and increasing United's profits, all at the expense of Meier's. The

quantity of work was reduced by change order 13-F to eliminate Meier's and then the identical amount was restored as an "excavation special" to be performed by United.

What we do have is a situation in which United, through its president, voluntarily involved itself in a third-party dispute having no impact on the I-435 project, United's contract, or Meier's hauling subcontract. Supica acted knowing full well the compromise he encouraged and later agreed to would work to United's own financial advantage while eliminating Meier's subcontract. In these circumstances the highly touted $1 million savings to the state is irrelevant to the rights and obligations of the parties to this suit. Supica exploited the entire situation to reap a financial bonanza for United, sacrificing nothing itself for the "public good." Under these circumstances I am not impressed with defendant's grandstanding about the public benefit resulting from its actions. In this connection it would be interesting to know how much KDOT paid for dirt, rock and other material used in the construction of the "Maltese Cross" interchange which would not have been necessary if the material had not been "wasted" to United under its scheme to eliminate Meier's from its contract.

The majority recognizes that the implied obligation of good faith applies to the parties' subcontract notwithstanding United's discretionary right to modify or omit the work to be done, but then goes on to find plaintiff's evidence insufficient as a matter of law to constitute bad faith. I suggest the facts of this case, showing repeated attempts by United to avoid its obligations under the subcontract by misrepresenting the existence of a "discrepancy" in the amount of excavation to be hauled and manipulating the resolution of the Clarkson dispute to its own substantial financial advantage at the expense of Meier's subcontract, constitutes sufficient, if not abundant, evidence to support Meier's claims of bad faith. Indicative of United's bad faith is its attempt to terminate the contract with Meier's by withholding payment of $24,029.43 admittedly owed for work already done. On November 6, 1981, United wrote to Meier's acknowledging it owed the money but requiring an affidavit which would terminate the contract with no further obligations by United. United officers obviously had reservations about change order 13-F which they had secured nearly a year before. It

appears that the amount justly owed Meier's was still not paid at the time of the directed verdict on January 19, 1984.

A number of common threads run throughout the myriad definitions of good faith. That duty includes an obligation of honesty in fact, violated in this case by United's misrepresentations about the state's "discrepancy" in the work to be performed, and by its representation to Meier's that the change order was an "omission" of the hauling work when in practical effect the change order was a *transfer* of the hauling work to United. Good faith includes fair dealing and a duty of cooperation, obligations which ran to plaintiff Meier's, not to KDOT and Clarkson. Good faith encompasses faithfulness to an agreed common purpose and restraint from unconscientious acts destroying plaintiff's right to receive the fruits of the subcontract, obligations which, if not violated by United's voluntary agreement to a nonessential modification of the I-435 project, were certainly violated when that action was undertaken with the knowledge United would financially benefit from the modification at Meier's expense. Finally, good faith also means that a discretionary power to specify terms or quantities will be exercised only in a manner faithful to and consistent with the purposes of a contract. That obligation was violated in this case when defendant eliminated Meier's subcontract for United's own pecuniary benefit, a patent abuse of defendant's discretionary power under the subcontract.

Professor Burton's commentary suggests the critical question in cases of this type is whether defendant exercised its discretion for a purpose within the reasonable contemplation of the parties to capture an opportunity preserved upon formation of the contract, interpreted objectively. Clearly, United's opportunity to perform the hauling work itself was forgone by subcontracting the work to Meier's. Further, interpreting the subcontract objectively, no one can seriously contend that at the time of its formation the parties reasonably contemplated United retained the right to unilaterally terminate the subcontract and perform the hauling work itself. Under such a construction, United would not have been bound to any performance under the contract which it might later desire to avoid. I do not believe that forbidden and unjust result should now be permitted simply

because defendant acted under the guise of a KDOT change order which United itself authored.

I suggest that far from being "insufficient as a matter of law" plaintiff's evidence establishes a prima facie case of bad faith, not because United enmeshed itself in the Clarkson dispute but because it did so with the obvious intent of eliminating Meier's Trucking from the I-435 project, thereby reaping a substantial financial advantage for itself. The majority's contrary conclusion strikes me as a de facto abandonment of the implied obligation of good faith because future plaintiffs will rarely be able to satisfy the stringent burden of proof now established.

The majority concludes its opinion by stating it would be poor public policy to penalize a general contractor for suggesting to the owner a possible means of saving money by changing construction plans. Under other circumstances it would be hard to disagree with that proposition, but as the sole justification for the majority's present holding it avoids the real issues involved in this case. It is even poorer public policy to adopt, as the majority now has, a rule encouraging illusory subcontracts which can be terminated with impunity by general contractors serving not the public good but their own financial self-interest.

I would reverse the directed verdicts and remand the case for a new trial on the second and third counts of plaintiff's petition.

LOCKETT, J., joins the foregoing dissent.